**Joseph ORMAN, Plaintiff,**

v.

**Edgar M. CULLMAN, Sr., Edgar M. Cullman, Jr., Susan R. Cullman, John L. Ernst, Peter J. Solomon, Bruce A. Barnet, John L. Bernbach, Thomas C. Israel, Dan W. Lufkin, Graham V. Sherren, Frances T. Vincent, Jr. and General Cigar Holdings, Inc., Defendants.**

Civil Action No. 18039.

Court of Chancery of Delaware.

Submitted: Dec. 21, 2001.
Decided: Feb. 26, 2002.
Revised: March 1, 2002.

Joseph A. Rosenthal, Carmella P. Keener, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, of counsel, Stephen A. Whinston, of Berger & Montague, P.C., Philadelphia, Pennsylvania, for plaintiff.

Robert J. Stearn, Jr., of Richards, Layton & Finger, Wilmington, Delaware, of counsel, Curtis P. Lu, Michael J. Golden, Mary E. Britton, of Latham & Watkins, Washington, D.C., Marc Wolinsky, Elaine P. Golin, of Wachtell, Lipton, Rosen & Katz, New York City, for defendants.

### *OPINION*

CHANDLER, Chancellor.

This purported class action involves alleged breaches of fiduciary duty in connection with the cash-out merger of the public shareholders ("Unaffiliated Shareholders" or "Public Shareholders") of General Cigar Holdings, Inc. ("General Cigar" or the "Company"). According to the complaint, plaintiff Joseph Orman ("Orman") is and was the owner of General Cigar Class A common stock at all times relevant to this litigation. Orman brings this suit on behalf of himself and the Public Shareholders of General Cigar Class A common stock against General Cigar and its eleven-member board of directors (collectively the "Board").[1]

---

1. The individual defendant Board members are: Edgar M. Cullman, Sr. ("Cullman Sr."),

■ On January 19, 2000 the Board unanimously approved a merger agreement pursuant to which a subsidiary of an unaffiliated third party, Swedish Match AB ("Swedish Match"), would purchase the shares owned by the Unaffiliated Shareholders of General Cigar.[2] On April 10, 2000 the Company filed with the Securities and Exchange Commission an amended proxy statement ("Proxy Statement") relating to this proposed merger.

The complaint first alleges breaches of fiduciary duty with respect to the Board's approval of (and the fairness of) the proposed merger. Orman contends that Board approval of the merger was ineffective and improper because a majority of the defendant directors was not independent and/or disinterested. He further alleges that the defendant directors violated their fiduciary duty of loyalty[3] by entering into a transaction that was unfair to the Public Shareholders of General Cigar and usurped for themselves corporate opportunities rightfully belonging to all General Cigar shareholders.

Orman also asserts that the Board breached its duty of disclosure. Specifically, he alleges that the Proxy Statement soliciting shareholder approval of the proposed merger omitted material facts necessary for the Public Shareholders to make a fully informed decision with regard to their vote for or against the merger.

The defendants moved pursuant to Court of Chancery Rule 12(b)(6) to dismiss the complaint on the grounds that: 1) Orman failed to plead facts sufficient to overcome the presumption of the business judgment rule with respect to the Board's approval of the merger transaction; 2) the merger was ratified by a fully informed majority vote of the Public Shareholders of General Cigar; and 3) Orman failed to plead cognizable disclosure claims. Moreover, even if Orman had successfully pled cognizable disclosure claims (defendants argue), any possible liability arising from

Edgar M. Cullman, Jr. ("Cullman Jr."), Susan R. Cullman ("Susan Cullman"), John L. Ernst ("Ernst"), Peter J. Solomon ("Solomon"), Bruce A. Barnet ("Barnet"), John L. Bernbach ("Bernbach"), Thomas C. Israel ("Israel"), Dan W. Lufkin ("Lufkin"), Graham V. Sherren ("Sherren"), and Frances T. Vincent, Jr. ("Vincent"). The first four directors listed are related to one another—Edgar M. Cullman, Sr. is the father of Edgar M. Cullman Jr. and Susan R. Cullman and John L. Ernst is the nephew of Cullman, Sr. and the cousin of Cullman, Jr. and Susan Cullman—and are collectively referred to as the "Cullman Group."

2. The merger provided that Swedish Match would acquire a 64%-equity "interest in General Cigar through a stock purchase and a merger of its wholly owned subsidiary, SM Merger Corporation, into General Cigar." Defs.' Opening Br., Ex. A at 1 (Proxy Statement). Swedish Match incorporated SM Merger Corporation as a Delaware corporation on January 13, 2000 in connection with the proposed merger. *Id.*, Ex. A at 8. Upon SM Merger Corporation's merger with and into General Cigar, the separate corporate existence of SM Merger Corporation would come to an end and the Company would continue to operate as the surviving corporation. *Id.*, Ex. A at 33.

3. Because the duty to act in "good faith" is merely a subset of a director's duty of loyalty, my consideration of Orman's duty of loyalty allegations necessarily includes a consideration of whether the facts pled suggest the defendants did not act in good faith with regard to their duty of loyalty to the Company. *See Emerald Partners v. Berlin*, Del.Ch., C.A. No. 9700, mem. op. at 64 n. 63, Jacobs, V.C., 2001 WL 115340 (Feb. 7, 2001) ("Although corporate directors are unquestionably obligated to act in good faith, doctrinally that obligation does not exist separate and apart from the fiduciary duty of loyalty. Rather, it is a subset or 'subsidiary requirement' that is subsumed within the duty of loyalty, as distinguished from being a compartmentally distinct fiduciary duty of equal dignity with the two bedrock fiduciary duties of loyalty and due care.").

those claims is barred by an exculpatory provision in the Company's certificate of incorporation, adopted pursuant to § 102(b)(7)[4] of the Delaware General Corporation Law, because only a duty of care violation is implicated by those disclosure claims.

I conclude that the defendants' motion to dismiss must be granted in part and denied in part. The motion to dismiss the duty of loyalty claims must be denied, as Orman has pled facts from which is it reasonable to question the independence and disinterest of a majority of the General Cigar Board. The motion to dismiss Orman's disclosure claims is granted as to all but one claim which, at this stage of the litigation, I cannot say is immaterial as a matter of law. Because I conclude that one of Orman's disclosure claims must survive as a matter of law, I am unable to find that any possible breaches of fiduciary duty in connection with the challenged transaction were ratified by a fully informed vote of a majority of the Company's disinterested shareholders. Finally, as I conclude that the complaint does not unambiguously state only a duty of care claim, it would be premature for me to consider the effect of the Company's exculpatory charter provision.

## I. STANDARD OF REVIEW

■ In considering a Rule 12(b)(6) motion to dismiss, the Court must assume the truthfulness of all well-pleaded facts contained in the complaint, view those facts and all reasonable inferences drawn therefrom in the light most favorable to the plaintiff, and determine with "reasonable certainty" whether the plaintiff would be entitled to relief under any set of facts that could be proven.[5] Conclusory allegations unsupported by facts contained in a complaint, however, will not be accepted as true.[6]

■ As a general rule, when deciding a Rule 12(b)(6) motion, the Court is limited to considering only the facts alleged in the complaint and normally may not consider documents extrinsic to it.[7] There are two exceptions, however, to this general rule. "The first exception is when the document is integral to a plaintiff's claim and incorporated into the complaint. The second exception is when the document is not being relied upon to prove the truth of its

---

4. 8 *Del.C.* § 102(b)(7) (2001).

5. *See Solomon v. Pathe Communications Corp.*, Del.Supr., 672 A.2d 35, 38 (1996); *see also Malpiede v. Townson*, Del.Supr., 780 A.2d 1075, 1083 n. 16 (2001) (stating that in the context of a Rule 12(b)(6) motion to dismiss, " 'well-pleaded allegations' include specific allegations of fact and conclusions supported by specific allegations of fact").

6. *See Solomon*, 672 A.2d at 38; *see also Grobow v. Perot*, Del.Supr., 539 A.2d 180, 188 n. 6 (1988) (stating that under Rule 12(b)(6) "all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true, but neither inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true"); *Crescent/Mach I Partners, L.P. v. Turner*, Del.Ch.,

C.A. No. 17455, mem. op. at 12, Steele, V.C., 2000 WL 1481002 (by designation) (Sept. 29, 2000) ("Notwithstanding Delaware's permissive pleading standard, I am permitted to disregard allegations which are merely conclusory and lack factual support."); *Lewis v. Vogelstein*, Del.Ch., 699 A.2d 327, 338 (1997) (stating that mere conclusory allegations unsupported by specific factual allegations are not sufficient to survive a motion to dismiss).

7. *See Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, Del. Supr., 691 A.2d 609, 612 (1996); *see also Malpiede*, 780 A.2d at 1082 ("The complaint ordinarily defines the universe of facts from which the trial court may draw in ruling on a motion to dismiss.").

contents."[8] Consideration of the Proxy Statement in this case is appropriate as it falls under both of these exceptions.

■■ First, the Proxy Statement is the basis for Orman's disclosure claims. Second, it is also integral to his complaint as it is the source for the merger-related facts as pled in the complaint.[9] Therefore, the Proxy Statement, and any other documents incorporated into it, are incorporated by reference into the complaint and will be considered on this motion.

## II. FACTUAL HISTORY[10]

General Cigar, a Delaware Corporation with its principal executive offices located in New York, New York, is a leading manufacturer and marketer of premium cigars. The Company has exclusive trademark rights to many well-known brands of cigars, including seven of the top ten brands that were previously manufactured in Cuba.[11]

The Company went public in an initial public offering ("IPO") of 6.9 million shares of Class A stock at $18.00 per share on February 28, 1997. As of March 30, 2000, the Company had approximately 13.6 million shares of Class A and 13.4 million shares of Class B common stock outstanding. Class A stock was publicly traded and Class B stock was not publicly traded. Class A stock had one vote per share and Class B had ten votes per share. Even though Class B shares had ten times—the voting power of Class A shares, the Company's Certificate of Incorporation required equal consideration in exchange for Class A and Class B shares in the event of a sale or merger. At the time of the proposed merger, the Cullman Group owned approximately 162 shares of Class A and 9.9 million shares of Class B. Although this aggregated to approximately 37% of the Company's total outstanding stock, the Cullman Group had voting control over the Company because the 9.9 million Class B shares it owned represented approximately 74% of that class, which enjoyed a 10:1 voting advantage over Class A shares.[12] The Cullman Group's equity interest, therefore, gave it approximately

---

**8.** *Vanderbilt,* 691 A.2d at 613 (citation omitted); *see also Noerr v. Greenwood,* Del.Ch., C.A. No. 14320, mem. op. at 6, Jacobs, V.C., 1997 WL 419633 (July 16, 1997) (stating that the Court will not "consider facts and documents extrinsic to the complaint, except for those that are 'integral to the claim and incorporated by reference into the complaint'" (quoting *Sapala v. Forest Health Service Corp.,* Del.Ch., C.A. No. 14260, ltr. op. at 3, Jacobs, V.C., 1996 WL 255905 (May 3, 1996))).

**9.** I note that it is only the undisputed facts contained in integral documents incorporated into a complaint by reference that are considered. The Court does not make its own determination as to the meaning of ambiguous or disputed language contained in those documents and then compare its interpretation with the facts as alleged by the plaintiff. *See Vanderbilt,* 691 A.2d at 613 ("On a motion to dismiss for failure to state a claim, a trial court cannot choose between two differing reasonable interpretations of ambiguous documents."). If a plaintiff's complaint alleges a fact that is unambiguously contradicted by an integral document incorporated into the complaint *and* there are no other facts in that document supporting the allegation, the Court need not accept as true the fact as alleged in the complaint. The Court may accept the fact as set forth in that incorporated document because, by doing so, the Court is not choosing between alternate interpretations of an ambiguous document but permissibly considering a fact recorded in a document integral to the plaintiff's claims.

**10.** These facts are taken from the well-pleaded allegations of the complaint or, where noted, undisputed facts contained in the Proxy Statement, which, as explained above, is incorporated by reference therein.

**11.** Compl. ¶¶ 2, 13.

**12.** *Id.* ¶ 14.

67% of the voting power in the corporation.

On April 30, 1999, in a transaction unrelated to the present controversy, the Company sold its cigar mass-marketing business to Swedish Match[13] for $200 million in order to focus solely on the Company's premium cigar market. In the early fall of 1999, Swedish Match approached certain members of the Cullman Group (the "Cullmans") about purchasing the interest in General Cigar owned by its Public Shareholders.[14] This was seen to be a logical business combination because General Cigar had a strong presence in the United States premium cigar market and Swedish Match had strength in the international cigar and smokeless tobacco markets through its established network of international contacts and resources.[15] At a November 4, 1999 General Cigar board meeting, the Cullmans informed the Board of Swedish Match's interest. The Board then authorized the Cullmans to pursue discussions with Swedish Match assisted by defendant director Solomon's financial advising firm, Peter J. Solomon & Company ("PJSC").

Negotiations between the Cullmans and Swedish Match continued during November and December 1999. By the end of December 1999 the structure for a proposed transaction had been determined.[16] That structure included: 1) a sale by the Cullman Group of approximately one-third of its equity interest in the Company to Swedish Match at $15.00 per share; 2) immediately following the Cullman Group's private sale, a merger in which all shares in the Company held by the Unaffiliated Shareholders would be purchased for $15.00 per share; 3) Cullman Sr. and Cullman Jr. maintaining their respective positions as Chairman and President/Chief Executive Officer of the surviving company and having the power to appoint a majority of the board; 4) three years after the merger, the Cullman Group having the power to put its remaining equity interest to the Company and the Company having the power to call such interest; and 5) an agreement by the Cullman Group that should the proposed transaction with Swedish Match not close, it would vote against any other business combination for a period of one year following the termination of the proposed transaction.[17]

Once the negotiations reached agreement on the above points, the Board created a special committee (the "Special Committee"), consisting of outside defendant directors Lufkin, Israel, and Vincent, to determine the advisability of entering into the proposed transaction.[18] The Special Committee retained independent legal and financial advisors—Wachtell, Lipton, Rosen & Katz and Deutsche Bank Securities, Inc., respectively—to assist them in this endeavor.[19] In early January 2000 the

---

13. Swedish Match is an international group headquartered in Stockholm, Sweden. Its principal office and business address are also located in Stockholm, Sweden. Swedish Match manufactures a broad range of tobacco products, matches and disposable lighters that are sold in approximately 140 countries. Swedish Match is listed on the Stockholm Stock Exchange and on NASDAQ (SWMAY). Defs.' Opening Br., Ex. A at 8 (Proxy Statement).

14. Id. ¶ 16; Defs.' Opening Br., Ex. A at 9 (Proxy Statement).

15. Defs.' Opening Br., Ex. A at 9 (Proxy Statement).

16. Compl. ¶¶ 15–17.

17. Id. ¶ 17(a)–(e).

18. Id. ¶ 18.

19. Defs.' Opening Br., Ex. A at 11 (Proxy Statement).

Special Committee received copies of the proposed agreements previously reached between the Cullmans and Swedish Match.[20] After a review of these proposals by the Special Committee and its legal and financial advisors, the Special Committee directly negotiated with Swedish Match over the terms of the agreement.[21] The substantive changes in the terms of the transaction resulting from negotiations by the Special Committee appear to be that the amount of consideration to be received by the Unaffiliated Shareholders for each of their Class A shares increased from $15.00 to $15.25 and the length of time the Cullman Group would not vote in favor of another business combination if the challenged merger failed to close increased from twelve to eighteen months. On January 19, 2000 the Special Committee unanimously recommended approval of the transaction as modified as a result of their negotiations. That same day, the General Cigar Board unanimously approved the transaction.[22]

The relevant terms of the final transaction recommended to the Company's shareholders, and subject to approval of the Unaffiliated Shareholders, included an initial private sale by the Cullman Group of 3.5 million shares of its Class B [23] stock, representing about one-third of its General Cigar equity interest, to Swedish Match for $15.00 per share. The Cullman Group was to retain its remaining equity interest, which would then consist of approximately 162 Class A shares and 6.4 million Class B shares. Following the merger, that remaining interest would aggregate to approximately 36% of the total outstanding equity interest in the Company.[24] Immediately following this private sale, a merger would take place in which all publicly owned Class A and Class B shares (those not owned by the Cullman Group) would be purchased for $15.25 per share.[25]

In addition to the Cullman Group's continuing equity position and voting control in the surviving company, several provisions of the proposed transaction assured ongoing participation of the Cullman Group in the day-to-day operations of that company. Cullman Sr. would retain his

20. Compl. ¶ 19.

21. Defs.' Opening Br., Ex. A at 9 (Proxy Statement).

22. Compl. ¶ 20.

23. The complaint at ¶ 21(a) states that "approximately 3.5 million shares of its Class A stock" would be sold. It is apparent from the statement in ¶ 21(c) that "the Cullman Group will retain their remaining shares consisting of approximately ... 6.4 million shares of Class B stock" that ¶ 21(a) should read "Class B stock."

24. Compl. ¶ 21(c). Because of the disproportionate 10:1 voting strength of the Class B shares compared to the Class A shares, the Cullman Group continued to have voting control over the surviving company and, therefore, the merger did not constitute a sale or transfer of control. It is unclear precisely how the Cullman Group's equity interest only dropped from 37% to 36% upon the sale of approximately one-third of its equity interest. This post-merger ownership percentage, however, is not challenged by Orman and is clearly set forth in the Proxy Statement. See, e.g., Defs.' Opening Br., Ex. A at 1 (Proxy Statement) (stating that "Swedish Match will acquire a 64% interest in General Cigar ... [and that the Cullman Group] will hold 36% of the surviving corporation following the stock purchase and merger"). The fact that the Cullman Group will continue to have voting control over the surviving company after the merger was also conceded by Orman. At oral argument, in discussing the Cullman Group's controlling position, the plaintiff stated, "to just quote from Lynch, 'This is a party that controls and will continue to control the company,' and the Cullmans fit into that and fit into it precisely." Tr. of Oral Argument at 44.

25. Id. ¶ 21(b).

position as Chairman of the Board of the surviving company and Cullman Jr. would continue to serve as President and CEO of the surviving company. The Cullman Group would have the power to appoint a majority of the board of the surviving company after the merger.[26]

Additionally, beginning three years from the date of the merger, the Cullman Group would have the option to put some or all of its remaining equity interest to the surviving company and the surviving company would have a reciprocal right to call some or all of the company's stock retained by the Cullman Group. The Cullman Group also agreed to vote against any proposed merger transaction for eighteen months should the transaction with Swedish Match not be consummated.[27]

Finally, the transaction was structured in such a way that the Cullman Group could not dictate its approval. Despite the fact that the Cullman Group possessed voting control over the Company both before and after the proposed transaction, approval of the merger required that a majority of the Unaffiliated Shareholders of Class A stock, voting separately as a class, vote in favor of the transaction.[28]

## III. ANALYSIS

### A. Fiduciary Duty Claims

Orman alleges that the Board's approval of the Company's merger with Swedish Match was ineffective and improper because a majority of the Board was not disinterested and independent and that the directors breached their duty of loyalty by approving a transaction that was unfair to the public shareholders.[29] Orman asserts that he has pled facts sufficient to rebut the presumption of the business judgment rule and that this Court should employ an "entire fairness" analysis. He contends that a determination that entire fairness is the appropriate standard would preclude dismissal at this stage of the litigation regardless of upon whom the Court ultimately were to place the burden of proving, or disproving, the transaction's entire fairness. The defendants contend that these claims must be dismissed because Orman has not pled facts sufficient to overcome the business judgment rule presumption and in such a case the actions of a board should be respected.

■■■ "A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[30] The business judgment rule is a recognition of that statutory precept. The rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best inter-

**26.** *Id.* ¶ 21(d)–(f). The complaint states that the Cullman Group announced that its appointments would be Cullman Sr., Cullman Jr., Barnet, and David Dazinger. These four will represent a majority of the new board as the surviving company will have a seven-member board. *See* Defs.' Opening Br., Ex. A at 23 (Proxy Statement).

**27.** Compl. ¶ 21(i)–(k).

**28.** *See* Defs.' Opening Br., Ex. A at 31 (Proxy Statement). In order to assure the Unaffiliat-
ed Shareholders had the unobstructed right to determine whether or not the merger would close, the Cullman Group "agreed to vote any Class A shares held by them pro rata in accordance with the vote of the Unaffiliated Shareholders." *Id.*

**29.** Compl. ¶¶ 22, 23.

**30.** *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 811 (1984) (citing 8 *Del.C.* § 141(a)).

ests of the company."[31] Therefore, the judgment of a properly functioning board will not be second-guessed and "[a]bsent an abuse of discretion, that judgment will be respected by the courts."[32] Because a board is presumed to have acted properly, "[t]he burden is on the party challenging the decision to establish facts rebutting the presumption."[33]

One way for a plaintiff to overcome this burden, for example, is to allege facts demonstrating a squeeze out merger or a merger between two corporations under the control of a controlling shareholder. If facts of that nature are sufficiently alleged, the business judgment presumption is rebutted and entire fairness is the standard of review. "A controlling or dominating shareholder standing on both sides of a transaction . . . bears the burden of proving its entire fairness."[34] Although procedural safeguards may be put in place that shift the burden to the plaintiff to prove the unfairness of the merger (i.e., the negotiation and approval of the transaction by a special committee of independent and disinterested directors or the requirement of approval by a majority of the company's minority shareholders), "[e]ntire fairness remains the proper focus of judicial analysis in examining an interested merger, irrespective of whether the burden of proof remains upon or is shifted away from the controlling or dominating shareholder."[35] Regardless of whether the burden of proof is shifted to the plaintiff, however, "[t]he *initial* burden" under entire fairness is borne by the controlling party "who stands on both sides of the transaction."[36]

---

**31.** *Id.* at 812.

**32.** *Id.; see also Parnes v. Bally Entertainment Corp.*, Del.Supr., 722 A.2d 1243, 1246 (1999) ("The presumptive validity of a business judgment is rebutted in those rare cases where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.' " (quoting *In re J.P. Stevens & Co., Inc.*, Del.Ch., 542 A.2d 770, 780–81 (1988))); *Cede & Co. v. Technicolor, Inc.*, Del. Supr., 634 A.2d 345, 361 (1993), *modified on reargument in part*, Del.Supr., 636 A.2d 956 (1994) ("The rule posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose.' " (quoting *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971))).

**33.** *Aronson*, 473 A.2d at 812.

**34.** *Kahn v. Lynch Communication Sys., Inc.*, Del.Supr., 638 A.2d 1110, 1115 (1994).

**35.** *Id.* at 1116.

**36.** *Id.* at 1117 (emphasis added). Usually, the entire fairness standard only applies at the outset ("*ab initio*") in certain special circumstances, viz, a squeeze out merger or a merger between two companies under the control of a controlling shareholder. *See, e.g., Kahn v. Lynch, supra.* Entire fairness review is not automatically triggered when a *non-controlling* shareholder appears on both sides of a challenged transaction. Moreover, as explained below, *see* pp. 18–19, the business judgment standard may apply even when *some* (but less than a majority) of the directors lack independence and/or are interested in the transaction. This distinction remains unaffected by the Supreme Court's recent *Emerald Partners v. Berlin*, Del.Supr., 787 A.2d 85, 90, Holland, J. (2001) ("*Emerald III* ") decision, in which the Court reiterated that entire fairness review applies when a controlling shareholder stands on both sides of a challenged transaction. There, the Supreme Court pointedly distinguished between factual settings demanding entire fairness review and those that require business judgment review. *See Emerald III*, 787 A.2d at 91–92. This distinction is of vital importance due to the effects, as a practical matter, of a determination that entire fairness is the appropriate standard from the outset ("*ab initio*").

As our Supreme Court has recognized, a determination that entire fairness is the appropriate standard of review "is often of criti-

cal importance." *Lynch*, 638 A.2d at 1116. That conclusion normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss. Once the business judgment rule presumption is rebutted, the burden of proof shifts to the defendant, who must either establish the entire fairness of the transaction or show that the burden of disproving its entire fairness must be shifted to the plaintiff. A determination of whether the defendant has met that burden will normally be impossible by examining only the documents the Court is free to consider on a motion to dismiss—the complaint and any documents it incorporates by reference. Besides foreclosing dismissal under Rule 12(b)(6), the requirement of an entire fairness review may also preclude the entry of a final judgment even after discovery on a motion for summary judgment, but only if there remains at that point unresolved questions of material fact on either of the two prongs of the entire fairness test. The more difficult of these two prongs to establish on a paper record, however, is the "fair price" prong. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (1983) (explaining that an entire fairness review is not bifurcated and considers both fair dealing and fair price and that fair price "relates to [all relevant] economic and financial considerations of the proposed [transaction]"). Although not inevitable in every case, in those cases in which entire fairness is the initial standard, the *likely* end result is that a determination of that issue will require a full trial.

Recognizing the practical implications of the automatic requirement of an entire fairness review has led our Supreme Court to limit such automatic requirement to the narrow class of cases in which there is a controlling shareholder on both sides of a challenged merger. In *Emerald III*, the Court explained that "[t]he category of transactions that require judicial review pursuant to the entire fairness standard *ab initio* do so because, by definition, the inherently interested nature of those transactions are inextricably intertwined with issues of loyalty." *Emerald III*, 787 A.2d at 93. The cases cited by the Court to support that statement all involved an entire fairness review when there was a controlling shareholder standing on both sides of the challenged transaction. *See id.* at 93, n. 45 (citing *Sterling v. Mayflower Hotel Corp.*, Del. Supr., 93 A.2d 107, 110 (1952) (stating that the majority shareholder standing "on both sides of the transaction, ... bear[s] the burden of establishing its entire fairness"); *Weinberger*, 457 A.2d at 710 (reiterating that when

a *controlling* shareholder proposed a cash-out merger, "[t]he requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness"); and *Lynch*, 638 A.2d at 1117 (continuing to assert that "the exclusive standard of judicial review in examining the propriety of an interested cash-out merger transaction *by a controlling or dominating shareholder* is entire fairness") (emphasis added)).

Thus, nothing in *Emerald III* should be read as being inconsistent with that distinction. *Emerald III* adhered to existing precedents which held that to require entire fairness *ab initio* a controlling entity, whether a parent corporation or individual shareholder, must stand on both sides of the challenged transaction. In *Emerald Partners* the challenged transaction was a merger between May Petroleum, Inc. ("May") and thirteen corporations owned by Craig Hall ("Hall"), May's chairman and CEO. *Emerald III*, 787 A.2d at 87. There, the Court had determined in an earlier appeal that "Hall, as Chairman and Chief Executive Officer of both May and the Hall corporations and sole owner of the Hall corporations, clearly stood on both sides of the transaction." *Emerald Partners v. Berlin*, Del. Supr., 726 A.2d 1215, 1221 (1999) ("*Emerald II*"). The Court there noted that "at the time the parties entered the proposed merger agreement ... Hall owned 52.4% of May common stock." *Id.* Therefore, both triggers for automatically invoking the entire fairness analysis—that an entity stands on both sides of the transaction and that such entity is a controlling shareholder—had been established. *After* the terms of the proposed mergers had been agreed upon, Hall reduced his beneficial interest in May to 25%. *Emerald III*, 787 A.2d at 88. The merger agreement presented to the shareholders, however, was the same (except for noting Hall's changed ownership level) as the agreement that had been negotiated when Hall held 52.4% of May's stock. *Id.* at 88. It was in this factual setting, where the challenged merger agreement was proposed by a *controlling* shareholder standing on both sides of the transaction, that the *Emerald III* Court noted Hall's subsequent ownership reduction and observed, " 'Hall's stance on both sides as a corporate fiduciary, *alone*, is sufficient to *require* the demonstration of entire fairness.' " *Id.* at 94 (quoting *Emerald II*, 726 A.2d at 1221 n. 8) (emphasis added by *Emerald III* ).

■ Here, however, although the Cullman Group was the controlling shareholder of the target company both before and after the merger, the Cullman Group did not stand on both sides of the challenged merger. Instead it was approached by, and began initial negotiations with, an unaffiliated third party, Swedish Match. A Special Committee of independent directors then completed those negotiations. Therefore, the burden remains on Orman to allege other facts sufficient to overcome the business judgment presumption. Specifically, Orman must allege facts that raise a reasonable doubt as to whether the Board breached either its duty of care or its duty of loyalty to the corporation. In his complaint, Orman alleges that the Board breached its duty of loyalty.

■ As a general matter, the business judgment rule presumption that a board acted loyally can be rebutted by alleging facts which, if accepted as true,

establish that the *board* was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders.[37] To establish that a *board* was interested or lacked independence, a plaintiff must allege facts as to the interest and lack of independence of the *individual members* of that board. To rebut successfully business judgment presumptions in this manner, thereby leading to the application of the entire fairness standard, a plaintiff must normally plead facts demonstrating "that a *majority* of the director defendants have a financial interest in the transaction or were dominated or controlled by a materially interested director."[38] I recognize situations can exist when the material interest of a number of directors *less* than a majority may rebut the business judgment presumption and lead to an entire fairness review. That is

And it is against that backdrop—Hall negotiating the merger agreement as a controlling shareholder standing on both sides of the challenged transaction—that the previously quoted sentence must be understood. The "corporate fiduciary" stance to which the Supreme Court was referring was Hall's fiduciary status as a *controlling* shareholder. Thus, the *Emerald III* decision, in my opinion, does not alter settled principles of Delaware law concerning the factual setting necessary for the initial application of entire fairness review.

37. *See State of Wisconsin Inv. Bd. v. Bartlett*, Del.Ch., C.A. No. 17727, mem. op. at 10–11, Steele, V.C., 2000 WL 238026 (Feb. 24, 2000) ("In the context of a merger, a breach of fiduciary duty analysis begins with the rebuttable presumption that a board of directors acted with care, loyalty, and in 'good faith.' Unless this presumption is sufficiently rebutted, raising a reasonable doubt about self-interest or independence, the Court must defer to the discretion of the board and acknowledge that their decisions are entitled to the protection of the business judgment rule."); *see also In re the Walt Disney Co.*

*Derivative Litig.*, Del.Ch., 731 A.2d 342, 351 (1998), *aff'd in part, rev'd in part on other grounds sub. nom. Brehm v. Eisner*, Del.Supr., 746 A.2d 244 (2000) ("Unless Plaintiffs can plead with specificity facts that rebut the presumption of the business judgment rule, that the Board was corrupted and could not make a decision fairly and independently, in the best interests of the Corporation, then the Board's decision will stand.").

38. *Crescent/Mach I Partners, L.P. v. Turner*, Del.Ch., C.A. No. 17455, mem. op. at 27, Steele, V.C., 2000 WL 1481002 (by designation) (Sept. 29, 2000) (emphasis added); *see also Cinerama, Inc. v. Technicolor, Inc.*, Del. Supr., 663 A.2d 1156, 1168 (1995) (affirming Court of Chancery determination that "if actual self-interest is present and affects a *majority of directors* approving a transaction, the entire fairness standard applies" (emphasis added)); *State of Wisconsin Inv. Bd.*, mem. op. at 11 ("In order to require application of the entire fairness standard, the plaintiff has to show that a majority of directors have a financial interest in the transaction or a motive to entrench themselves in office through the merger.").

when an " 'interested director *fail[ed] to disclose his interest* in the transaction to the board *and* a reasonable board member would have regarded the existence of the material interest as a significant fact in the evaluation of the proposed transaction.' " [39] Nevertheless, in this case the interest that may be attributed to the Cullman Group or other Board members *was* disclosed to the Board and, therefore, Orman still must establish that a majority of the Board was interested and/or lacked independence.

If a plaintiff alleging a duty of loyalty breach is unable to plead facts demonstrating that a majority of a board that approved the transaction in dispute was interested and/or lacked independence, the entire fairness standard of review is not applied and the Court respects the business judgment of the board.[40] Whether a particular director is disinterested or independent is a recurring theme in Delaware's corporate jurisprudence. We reach conclusions as to the sufficiency of allegations regarding interest and independence only after considering all the facts alleged on a case-by-case basis.

■■■■ The *Aronson* Court set forth the meaning of "interest" and "indepen-dence" in this context. It defined interest as "mean[ing] that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." [41] This definition was further refined in *Rales v. Blasband* when our Supreme Court recognized that "[d]irecto-ral interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corpo-ration and the stockholders." [42] It should be noted, however, that in the absence of self-dealing, it is not enough to establish the interest of a director by alleging that he received *any* benefit not equally shared by the stockholders. Such benefit must be alleged to be *material* to that director.[43] Materiality means that the alleged benefit was significant enough *"in the context of the director's economic circumstances,* as to have made it improbable that the di-rector could perform her fiduciary duties to the . . . shareholders without being in-fluenced by her overriding personal inter-est." [44]

**39.** *Cinerama, Inc. v. Technicolor, Inc.*, Del. Supr., 663 A.2d 1156, 1168 (1995) (emphasis and alteration in original) (quoting *Cinerama, Inc. v. Technicolor, Inc.*, Del.Ch., 663 A.2d 1134, 1153 (1994)).

**40.** In the special category of cases involving a squeeze out merger, or a merger between two corporations under the domination of a con-trolling shareholder, the entire fairness stan-dard is triggered automatically (*"ab initio"*). *See* footnote 36, *supra.*

**41.** *Aronson*, 473 A.2d at 812; *see also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (1993) ("Classic examples of director self-in-terest in a business transaction involve either a director appearing *on both sides* of a trans-action or a director receiving a personal bene-fit from a transaction not received by the shareholders generally.").

**42.** Del.Supr., 634 A.2d 927, 936 (1993); *see also Disney*, 731 A.2d at 354 (citing the *Rales* definition of interest).

**43.** *Cede*, 634 A.2d at 363.

**44.** *In re General Motors Class H Shareholders Litig.*, Del.Ch., 734 A.2d 611, 617 (1999) (em-phasis added); *see also In re Freeport–McMo-ran Sulphur, Inc. Shareholders Litig.*, Del.Ch., C.A. No. 16729, mem. op. at 13–14, Jacobs, V.C., 2001 WL 50203 (Jan. 11, 2001). This is not to say that "material" is *the* magic word that must be included in a complaint before this Court will question a director's interest. Conversely, including an allegation that a benefit is "material" to the director in ques-tion, without more, would merely be a con-clusory allegation and insufficient to raise a reasonable doubt of interest. While it is cer-tainly more compelling for a plaintiff first to

 On the separate question of independence, the *Aronson* Court stated that "[i]ndependence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[45] Such extraneous considerations or influences may exist when the challenged director is controlled by another. To raise a question concerning the independence of a particular board member, a plaintiff asserting the "control of one or more directors must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.' The shorthand shibboleth of 'dominated and controlled directors' is insufficient."[46] This lack of independence can be shown when a plaintiff pleads facts that establish "that the directors are 'beholden'

to [the controlling person] or so under their influence that their discretion would be sterilized."[47]

In determining the sufficiency of factual allegations made by a plaintiff as to either a director's interest or lack of independence, the Delaware Supreme Court has rejected an objective "reasonable director" test and instead requires the application of a subjective "actual person" standard to determine whether a *particular* director's interest is material and debilitating or that he lacks independence because he is controlled by another.[48]

 General Cigar had an eleven-member board. In order to rebut the presumptions of the business judgment rule, Orman must allege facts that would support a finding of interest or lack of independence for a majority, or at least

---

plead that an alleged interest is material to a particular defendant director and then to allege facts to support that assertion, so long as facts are pled from which a reasonable inference can be drawn that the benefit received from a challenged transaction by that director to the exclusion of the shareholders generally is material to him, a finding of interest may follow.

**45.** *Aronson,* 473 A.2d at 816.

**46.** *Id.* at 816 (citation omitted) (quoting *Kaplan v. Centex Corp.,* Del.Ch., 284 A.2d 119, 123 (1971)).

**47.** *Rales,* 634 A.2d at 936; *see also Aronson,* 473 A.2d at 815 (stating that one way to allege successfully that an individual director is under the control of another is by pleading "such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person"); *Friedman v. Beningson,* Del.Ch., C.A. No. 12232, mem. op. at 9, Allen, C., 1995 WL 716762 (Dec. 4, 1995) ("The requirement that directors exercise *independent judgment,* (*insofar as it is a distinct prerequisite to business judgment review from a requirement that directors exercise financially disinterested judg-*

*ment* ), directs a court to an inquiry into all of the circumstances that are alleged to have inappropriately affected the exercise of board power. This inquiry may include the subject whether some or all directors are 'beholden' to or under the control, domination or strong influence of a party with a material financial interest in the transaction under attack, which interest is adverse to that of the corporation." (emphasis in original)).

**48.** *Cinerama,* Del.Supr., 663 A.2d at 1167 (agreeing with the Court of Chancery that the use of a subjective standard was the appropriate one for determining the materiality of a director's *financial interest* in that case, noting "[t]he subjective standard is consistent with this Court's observation, in *Cede II,* that requiring a shareholder plaintiff to show 'the materiality of a director's self-interest to the *given* director's independence' was a 'restatement of established Delaware law' " (quoting *Cede,* 634 A.2d at 363) (emphasis in quotation in original)); *see also McMullin v. Beran,* Del. Supr., 765 A.2d 910, 923 (2000) ("In assessing director *independence,* Delaware courts apply a subjective 'actual person' standard to determine whether a 'given' director was likely to be affected in the same or similar circumstances." (emphasis added)).

six, of the Board members. Orman asserts, and defendants appear to concede, that the four members of the Cullman Group were interested because they received benefits from the transaction that were not shared with the rest of the shareholders.[49] Orman, therefore, would have to plead facts making it reasonable to question the interest or independence of two of the remaining seven Board members to avoid dismissal based on the business judgment rule presumption. With varying levels of confidence, Orman's complaint alleges that each of the seven remaining Board members—Israel, Vincent, Lufkin, Barnet, Sherren, Bernbach, and Solomon—were interested and/or lacked independence.[50]

**49.** The Proxy Statement makes explicit reference to this conflict of interest in the section headed "QUESTIONS AND ANSWERS ABOUT THE MERGER." A question concerning "what conflicts of interest did the Board of Directors have in making its recommendation" that the Unaffiliated Shareholders approve the merger was answered with an acknowledgment that "[f]our of the Company's eleven directors have a conflict of interest in recommending adoption of the Merger Agreement because, as members of the [Cullman Group], they will continue to have an equity interest in the Surviving Corporation. As a result, they will receive the benefits of future earnings, growth and increased value of General Cigar, and be subject to the risks of such ownership, while [the cashed-out Unaffiliated Shareholders] will no longer receive any such benefit or be subject to such risks." Defs.' Opening Br., Ex. A at 1 (Proxy Statement).

**50.** *See* Compl. ¶¶ 18, 22(b)-(f). Although interest and independence are two separate and distinct issues, these two attributes are sometimes confused by parties. Many plaintiffs allege facts which they assert establish that the defendant "lacked the disinterest and/or independence" necessary to consider the challenged transaction objectively. The plaintiff then asks the Court to select whichever type of disabling attribute is consistent with the facts alleged and that will support the plaintiff's claim. But it is not for the Court to divine the claims being made. A plaintiff must make clear to the Court the bases upon which his claims rest.

As described above, a disabling "interest," as defined by Delaware common law, exists in two instances. The first is when (1) a director personally receives a benefit (or suffers a detriment), (2) as a result of, or from, the challenged transaction, (3) which is not generally shared with (or suffered by) the other shareholders of his corporation, and (4) that benefit (or detriment) is of such subjective material significance to that particular director that it is reasonable to question whether that director objectively considered the advisability of the challenged transaction to the corporation and its shareholders. The second instance is when a director stands on both sides of the challenged transaction. *See* 8 *Del.C.* § 144. This latter situation frequently involves the first three elements listed above. As for the fourth element, whenever a director stands on both sides of the challenged transaction he is deemed interested and allegations of materiality have not been required.

"Independence" does not involve a question of whether the challenged director derives a benefit *from the transaction* that is not generally shared with the other shareholders. Rather, it involves an inquiry into whether the director's decision resulted from that director being *controlled* by another. A director can be controlled by another if in fact he is *dominated* by that other party, whether through close personal or familial relationship or through force of will. A director can also be controlled by another if the challenged director is *beholden* to the allegedly controlling entity. A director may be considered beholden to (and thus controlled by) another when the allegedly controlling entity has the unilateral power (whether direct or indirect through control over other decision makers), to decide whether the challenged director continues to receive a benefit, financial or otherwise, upon which the challenged director is so dependent or is of such subjective material importance to him that the threatened loss of that benefit might create a reason to question whether the controlled director is able to consider the corporate merits of the challenged transaction objectively.

*Confusion over whether specific facts raise a question of interest or independence arises* from the reality that similar factual circumstances may implicate *both* interest and independence, one but not the other, or neither.

### 1. *Directors Israel and Vincent*

Perhaps the weakest allegations of interest and/or lack of independence are aimed at directors Israel and Vincent, who were both members of the Special Committee that investigated the advisability of the merger and negotiated with Swedish Match. The complaint states that these two defendants "had longstanding business relations with members of the Cullman Group which impeded and impaired their ability to function independently and outside the influence of the Cullman Group." [51] The only fact pled in support of this assertion is the mere recitation that Israel and Vincent had served as directors of General Cigar since 1989 and 1992, respectively. [52] In his brief opposing defendants' motion to dismiss, Orman apparently concedes that Israel and Vincent are independent by omitting these two directors from his contention that, in addition to the Cullman Group, "[p]laintiff has sufficiently pled that Sherren, Bernbach, Solomon and Lufkin also suffer disabling conflicts of interest and lack of independence in connection with the transaction." [53]

■ At this stage of the litigation, however, the Court must address itself to the allegations contained in the complaint.

By way of example, consider the following: Director *A* is both a director and officer of company *X*. Company *X* is to be merged into company *Z*. Director *A*'s vote in favor of recommending shareholder approval of the merger is challenged by a plaintiff shareholder.

Scenario One. Assume that one of the terms of the merger agreement is that director *A* was to be an officer in surviving company *Z*, *and* that maintaining his position as a corporate officer in the surviving company was material to director *A*. That fact might, when considered in light of *all* of the facts alleged, lead the Court to conclude that director *A* had a disabling interest.

Scenario Two. Assume that director *C* is both a director and the majority shareholder of company *X*. Director *C* had the power plausibly to threaten director *A*'s position as officer of corporation *X* should director *A* vote against the merger. Assume further that director *A*'s position as a corporate officer is material to director *A*. Those circumstances, when considered in light of *all* of the facts alleged, might lead the Court to question director *A*'s independence from director *C*, because it could reasonably be assumed that director *A* was controlled by director *C*, since director *A* was beholden to director *C* for his position as officer of the corporation. Confusion over whether to label this disability as a disqualifying "interest" or as a "lack of independence" may stem from the fact that, colloquially, director *A* was "interested" in keeping his job as a corporate officer. Scenario Two, however, raises only a question as to director *A*'s independence since there is nothing that suggests that director *A* would receive something *from the transaction* that might implicate a disabling interest.

If a plaintiff's allegations combined all facts described in both Scenario One *and* Scenario Two, it might be reasonable to question *both* director *A*'s interest and independence. Conversely, if all the facts in both scenarios were alleged *except* for the materiality of Director *A*'s position as a corporate officer (perhaps because director *A* is a billionaire and his officer's position pays $20,000 per year and is not even of prestige value to him) then *neither* director *A*'s interest nor his independence would be reasonably questioned. The key issue is not simply whether a particular director receives a benefit from a challenged transaction not shared with the other shareholders, or solely whether another person or entity has the ability to take some benefit away from a particular director, but whether the possibility of gaining some benefit or the fear of losing a benefit is likely to be of such importance to that director that it is reasonable for the Court to question whether valid business judgment or selfish considerations animated that director's vote on the challenged transaction.

**51.** Compl. ¶ 18.

**52.** *Id.*

**53.** Pl.'s Br. in Opposition at 9.

To make clear my opinion as to the independence of directors Israel and Vincent, therefore, I conclude that the allegations in the complaint with regard to the lack of independence of these two directors fail as a matter of law. The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence. The law in Delaware is well-settled on this point. For instance, in *Crescent/Mach I Partners, L.P.* this Court held that allegations of a "long-standing 15–year professional and personal relationship" between a director and the CEO and Chairman of the Board of his company were insufficient to support a finding of control.[54] The Court stated that such allegations, without more, "fail[ed] to raise a reasonable doubt that [the director] could not exercise his independent business judgment in approving the transaction. Therefore, these allegations lack the specific factual predicate" necessary to survive a motion to dismiss.[55] Here too, allegations concerning long-standing business relations fail as a matter of law to place in issue the independence of directors Israel and Vincent.[56]

**54.** Del.Ch., C.A. No. 17455, mem. op. at 30, Steele, V.C., 2000 WL 1481002 (by designation) (Sept. 29, 2000).

**55.** *Id.* (footnote omitted); *see also State of Wisconsin Inv. Bd. v. Bartlett,* Del.Ch., C.A. No. 17727, mem. op. at 17, Steele, V.C., 2000 WL 238026 (Feb. 24, 2000) (stating that "[e]vidence of personal and/or past business relationships does not raise an inference of self-interest"); *Disney,* 731 A.2d at 355 ("The fact that [the Chairman/CEO] has long-standing personal and business ties to [the employee] cannot overcome the presumption of independence that all directors … are afforded."). Although mere recitation of the fact of past business or personal relationships will not make the Court automatically question the independence of a challenged director, it may be possible to plead additional facts concerning the length, nature or extent of those previous relationships that would put in issue that director's ability to objectively consider the challenged transaction. *See, e.g., In re Ply Gem Industries, Inc. Shareholders Litig.,* Del. Ch., C.A. No. 15779–NC, let. op. at 4, Noble, V.C., 2001 WL 1192206 (Sept. 28, 2001) (stating that "past benefits conferred by [the allegedly dominating director], or conferred as the result of [that director's] position with Ply Gem, *may establish an obligation or debt (a sense of 'owingness')* upon which a reasonable doubt as to a director's loyalty to a corporation may be premised") (emphasis added); *In re New Valley Corp. Derivative Litig.,* Del.Ch., C.A. No. 17649, mem. op. at 19, Chandler, C., 2001 WL 50212 (Jan. 11, 2001) (noting in connection with the Court's consideration of allegations of interest and lack of independence that, "[t]he facts alleged in the complaint show that all the members of the current Board have current *or* past business, personal, and employment relationships with each other and the entities involved") (emphasis added).

**56.** I note that Israel and Vincent, as well as each of the other Board members, were also shareholders of General Cigar. *See* Defs.' Opening Br., Ex. A at 45 (Proxy Statement) (reporting the stock ownership of each Board member). As a general matter, that is a fact that weighs in support of the presumption that a director objectively considered the merits of the proposed corporate transaction in determining how to cast his vote on that transaction. A director who is also a shareholder of his corporation is more likely to have interests that are aligned with the other shareholders of that corporation as it is in his best interest, as a shareholder, to negotiate a transaction that will result in the largest return for all shareholders. Of course, the weight given that fact varies with the substantiality of the challenged director's holdings. *See, e.g., Unitrin, Inc. v. American General Corp.,* Del.Supr., 651 A.2d 1361, 1380–81 (1995) (stating that, "[i]n particular, it cannot be presumed that the prestige and perquisites of holding a director's office or a motive to strengthen collective power prevails over a stockholder-director's economic interest…. *[S]tockholders are presumed to act in their own best economic interests* when they vote in a proxy contest") (emphasis added); *Cf. Chesapeake Corp. v. Shore,* Del.Ch., 771 A.2d 293, 328 (2000) ("*If stockholders are presumed competent to buy stock in the first place, why are they not presumed competent to decide when to sell in a tender offer after an adequate time for deliberation has been afforded them?* ") (emphasis in original).

### 2. *Director Lufkin*

Orman asserts that director Lufkin, who was the third member of the Special Committee, lacked independence and was also interested in the merger transaction. With regard to Lufkin's purported lack of independence, Orman makes the same allegations as were directed at Israel and Vincent, namely, Lufkin "had longstanding business relations with members of the Cullman Group which impeded and impaired [his] ability to function independently and outside the influence of the Cullman Group. Defendant Lufkin had been a Board member of General Cigar or its predecessor since 1976." [57] For the reasons stated above (and with the caveat expressed in footnote 55), such bare allegation fails as a matter of law to assert a lack of independence on the part of director Lufkin.

▬▬▬ Lufkin's supposedly disabling interest results from the fact that he was "a founder of Donaldson, Lufkin & Jenrette ("DLJ") [and that] DLJ, or a successor or affiliate thereof, was one of two lead underwriters in the Company's IPO and obtained a substantial fee as a result thereof." [58] This bare statement of fact does not suggest, or even lead to a reasonable inference of, a disabling interest on the part of Lufkin as that statement does not show that he " 'will receive a personal financial benefit from [the] transaction that is not equally shared by the stockholders.' " [59] Inadequate pleadings in support of separate allegations of interest and lack of independence cannot be combined to create an inference that a director's conduct was improper. Here, the complaint fails, as a matter of law, to set forth facts that would lead this Court to question the presumed objectivity of director Lufkin in making his decision to vote in favor of the merger with Swedish Match.

### 3. *Director Barnet*

▬▬▬ The *only* fact alleged in support of Orman's allegation of director Barnet's interest is that he "has an interest in the transaction since he will become a director of the surviving company." [60] No case has been cited to me, and I have found none, in which a director was found to have a finan-

---

57. Compl. ¶ 18.

58. *Id.* ¶ 22(e).

59. *In re the Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 354 (1998) (quoting *Rales v. Blasband*, Del.Supr., 634 A.2d 927, 936 (1993)). It is of no help to Orman that he improperly attempts to expand the scope of his complaint in his brief opposing the motion to dismiss by adding the new allegation that "his [Lufkin's] company could not reasonably hope to attract the future business of General Cigar . . . if he were to vote against the merger." Pl.'s Br. in Opposition at 12. As stated above, at this stage of litigation, the Court is only permitted to consider the well-pleaded facts contained in the complaint and any documents incorporated by reference into that complaint. Should a plaintiff become aware that the allegations set forth in his complaint are inadequate to support his claim, he should request leave of the Court to amend his complaint rather than attempt to expand its scope through briefing. *See* Court of Chancery Rule 15(aaa). Briefs relating to a motion to dismiss are not part of the record and any attempt contained within such documents to plead new facts or expand those contained in the complaint will not be considered. Even if Orman's new allegation were to be considered by the Court, which it is not, it would still be unconvincing as the Proxy Statement, which is incorporated by reference into the complaint and *is* a proper document for consideration, reveals that Lufkin is no longer a part of DLJ, thus rendering null Orman's already inadequate pleading with regard to this defendant. *See* Defs.' Opening Br., Ex. A at 49 (Proxy Statement) (listing director Lufkin's "Principal Occupation and Business Experience During the Past Five Years" as that of a "Private investor").

60. Compl. ¶ 22(c).

cial interest *solely* because he will be a director in the surviving corporation. To the contrary, our case law has held that such an interest is not a disqualifying interest.[61] Even if I were to infer that Orman was alleging that the fees Barnet was to receive as a director with the surviving company created a disabling interest, without more, that assertion would also fail.[62] Because Orman alleges no facts in addition to the assertion of continued board membership on the part of Barnett, his assertion of interest fails as a matter of law.

### 4. Director Bernbach

Orman alleges that director Bernbach was both interested in the merger and lacked the independence to make an impartial decision regarding that transaction because he has "a written agreement with the Company to provide consulting services [and that] [i]n 1998 ... Bernbach was paid $75,000 for such services [63] ... and additional funds since that date." [64] Orman further asserts that the Proxy Statement did not reveal the existence of the consulting contract, which was executed in 1997, or "that that the surviving company inherits the Company's contrac-

tual obligations to Defendant Bernbach." [65] Contrary to defendants' assertion that Orman has failed to plead any continuing obligation on the part of General Cigar to Bernbach, his complaint clearly states such a continuing obligation.

Orman asserts that Bernbach has a written consulting contract with General Cigar, and that he had received, and continued to receive, payments under this contract. He further alleges that the surviving company will be obligated to uphold the contracts of the existing company. Such well-pleaded facts, accepted as true on a motion to dismiss, plainly allege a continuing obligation. Unfortunately for Orman, however, this clearly stated allegation is fatal to his assertion that Bernbach was interested in the transaction. As this Court has stated previously, "a director is considered interested when he will receive a personal financial benefit *from a transaction* that is not equally shared by the stockholders." [66] Accepting Orman's allegations as true reveals that Bernbach does not meet this definition of "interest." Bernbach had a contract with General Cigar. If the merger were consummated, he would have a contract that the surviving

---

61. *See Krim v. ProNet, Inc.*, Del.Ch., 744 A.2d 523, 528 n. 16 (1999) ("[T]he fact that several directors would retain board membership in the merged entity does not, standing alone, create a conflict of interest.").

62. *See, e.g., Grobow v. Perot*, Del.Supr., 539 A.2d 180, 188 (1988) ("The only averment permitting such an inference [of financial interest on the part of the directors] is the allegation that all GM's directors are paid for their services as directors. However, such allegations, without more, do not establish any financial interest."); *cf. Moran v. Household Int'l, Inc.*, Del.Ch., 490 A.2d 1059, 1074–75 (1985) ("Where a majority of the directors are independent or outside directors receiving no income other than usual directors' fees the presumption of good faith is heightened."). It is worth noting that these cases were based

on circumstances in which the fees paid to directors were customary and usual in amount. This Court's view of the disqualifying effect of such fees might be different if the fees were shown to exceed materially what is commonly understood and accepted to be a usual and customary director's fee.

63. Compl. ¶ 22(f).

64. *Id.* ¶ 24(c).

65. *Id.*

66. *In re Western Nat'l Corp. Shareholders Litig.*, Del.Ch., C.A. No. 15927, mem. op. at 28, Chandler, C., 2000 WL 710192 (May 22, 2000) (citing *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984)) (emphasis added).

company would be obligated to honor. If the merger were not consummated he would still have his contract with the existing General Cigar that it would be obligated to honor. Therefore, director Bernbach would have received no benefit *from the transaction* being challenged that was not shared by the other General Cigar shareholders. As a result of the merger, shareholder Bernbach would be cashed out and receive the same consideration for his General Cigar stock as the rest of the Unaffiliated Shareholders. Since he was to receive the same benefit as the Company's other shareholders, his interest in getting as high a price as possible for the Company's stock from the merger transaction was aligned with the Unaffiliated Shareholders. Orman's complaint, therefore, fails to plead adequately that director Bernbach was interested in the merger. This conclusion obviates the need to examine, for the purpose of determining whether a disabling interest existed, the defendants' further assertion that even if some interest were sufficiently alleged, Orman failed to plead the materiality of that contract to Bernbach.

Orman also argues that Bernbach's consulting agreement suggests a lack of independence. At this stage of the litigation, the facts supporting this allegation are sufficient to raise a reasonable inference that director Bernbach was controlled by the Cullman Group because he was beholden to the controlling shareholders for future renewals of his consulting contract. In addition to the facts specifically set forth in the complaint, the Proxy Statement reveals that, at the time of the challenged transaction, Bernbach's principal occupation was "Chairman and Chief Executive officer of the Bernbach Group, Inc." [67] Accepting as true all the well-pled allegations

and the inferences reasonably drawn therefrom in this case, I believe it is reasonable to question the objectivity of a director who has a consulting contract with his company and will continue to have a consulting contract with the surviving company. This is particularly true when, regardless of whether the merger is approved or not, the challenged director is beholden to the identical group of controlling shareholders favoring the challenged transaction. The Cullman Group would continue to be in a position to determine whether particular contracts are to be renewed as well as the extent to which the company will make use of the consulting services already under contract. Even though there is no bright-line dollar amount at which consulting fees received by a director become material, at the motion to dismiss stage and on the facts before me, I think it is reasonable to infer that $75,000 would be material to director Bernbach and that he is beholden to the Cullman Group for continued receipt of such fees. Although not determinative, the inference of materiality is strengthened when the allegedly disabling fee is paid for the precise services that comprise the principal occupation of the challenged director.

### 5. *Director Solomon*

Orman alleges that "Defendant Solomon has an interest in the transaction since his company, PJSC, stands to reap fees of $3.3 million if the transaction is effectuated." [68] The reasonable inference that can be drawn from this contention is that if the merger is consummated PJSC will receive $3.3 million. If the merger is not consummated PJSC will not receive $3.3 million. PJSC, therefore, has an interest in the

---

67. Defs.' Opening Br., Ex. A at 48 (Proxy Statement).

68. Compl. ¶ 22(b).

transaction. Because director Solomon's principal occupation is that of "Chairman of Peter J. Solomon Company Limited and Peter J. Solomon Securities Company Limited," [69] it is reasonable to assume that director Solomon would personally benefit from the $3.3 million *his* company would receive if the challenged transaction closed. I think it would be naïve to say, as a matter of law, that $3.3 million is immaterial. In my opinion, therefore, it is reasonable to infer that director Solomon suffered a disabling interest when considering how to cast his vote in connection with the challenged merger when the Board's decision on that matter could determine whether or not his firm would receive $3.3 million.

Directors Bernbach and Solomon, at this stage, cannot be considered independent and disinterested. Orman has thus pled facts that make it reasonable to question the independence and/or disinterest of a majority of the General Cigar Board—the four Cullman Group directors, plus Bernbach and Solomon, or six out of the eleven directors. Accordingly, I cannot say, as a matter of law, that the General Cigar Board's actions are protected by the business judgment rule presumption. Defendants' motion to dismiss the fiduciary duty claims—based as it is on a conclusion that the challenged transaction was approved by a disinterested and independent board—must be denied. [70]

Reaching this decision with regard to the loyalty of the Board that approved the merger, however, does not rebut the business judgment presumption at this stage of the litigation. It merely means that the business judgment presumption may not be used as the basis to dismiss Orman's fiduciary duty claims for failure to state a cognizable claim. Further discovery is necessary to determine whether the facts—as they truly existed at the time of the challenged transaction, rather than those accepted as necessarily true as alleged—are sufficient to rebut the business judgment rule presumption and to trigger an entire fairness review. Thus it is unnecessary for me presently to consider Orman's allegations concerning the purported unfairness of the price and process of the merger. [71] Such allegations will become relevant only if the business judgment presumption is finally determined to have been successfully rebutted.

### B. Disclosure Allegations

■ Orman next alleges that the Proxy Statement contained material omissions and misstatements. [72] In order for a plaintiff to state properly a claim for breach of a disclosure duty by omission, he must "plead facts identifying (1) material, (2) reasonably available (3) information that (4) was omitted from the proxy materials." [73] In order for alleged misrepresentations to be material, there must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed

---

**69.** Defs.' Opening Br., Ex. A at 49 (Proxy Statement).

**70.** Since Orman has pled facts from which it is reasonable to question the independence of two of the seven disputed directors, it is unnecessary for me to consider his allegations with regard to director Sherren. Even if I were to determine that it was not reasonable to question either the interest or independence of director Sherren, there would still not be a majority of disinterested and inde-

pendent directors upon which the defendants could rely for the dismissal of Orman's fiduciary duty claims.

**71.** Compl. ¶ 23(a)–(g).

**72.** *Id.* ¶ 24.

**73.** *O'Reilly v. Transworld Healthcare, Inc.*, Del.Ch., 745 A.2d 902, 926 (1999).

by the reasonable investor as having significantly altered the 'total mix' of information made available" to the shareholders.[74]

■ Contrary to Orman's contention that a determination of the materiality of disclosure allegations is not appropriate on a motion to dismiss, this Court has, on several occasions in the context of a motion to dismiss, found it appropriate to dismiss disclosure claims on the basis that the complained of omission was not material.[75] Orman's reliance on *Crescent/Mach I Partners, L.P. v. Turner*[76] to support his contention is misplaced. In that case the Court refused to dismiss the complaint not because a determination of materiality was inappropriate on a motion to dismiss, but precisely because the plaintiff was able to plead sufficiently "all of the elements necessary to *survive* a motion to dismiss for breach of the fiduciary duty of disclosure."[77] In fact, the Court there stated that materiality "*is* a matter for the Court to determine from the record at that particular stage of a case when the issue arises."[78] It is proper, therefore, for this Court to address the question of the materiality of the plaintiff's alleged omissions in the context of a Rule 12(b)(6) motion to dismiss.

Orman lists seven omissions from the Proxy Statement that he asserts would have affected the voting of the Unaffiliated Shareholders had that information been included.[79] First, he alleges the Proxy Statement omitted the fact that defendant Barnet was subject to a conflict of interest and/or lacked independence because he was designated as a director of the surviving corporation and would benefit from the transaction through fees, stock options and other benefits of a directorship.[80] Second, the Proxy Statement omitted the fact that defendant Solomon was subject to a conflict of interest and/or lacked independence because his company, Peter J. Solomon & Co. ("PJSC"), stood to make a fee of $3.3 million if the transaction was consummated.[81] Third, the Proxy Statement did not disclose that in 1997 General Cigar entered into a consulting contract with defendant Bernbach, the amount Bernbach received under that contract, and that the surviving company would inherit General Cigar's contractual obligations to Bernbach.[82] Fourth, the Proxy Statement did not disclose that defendant Cullman Sr. had been the Chairman of the Compensation Committee of the Board of Directors of Centaur Communications Ltd., ("Cen-

**74.** *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 944 (1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

**75.** *See, e.g., Malpiede v. Townson*, Del.Supr., 780 A.2d 1075, 1086 n. 35 (2001) (citing cases in which dismissal was appropriate because the statements or omissions were immaterial as a matter of law).

**76.** Del.Ch., C.A. No. 17455, mem. op., Steele, V.C., 2000 WL 1481002 (by designation) (Sept. 29, 2000).

**77.** *Id.* at 44 (emphasis added); *see also Malpiede*, 780 A.2d at 1086–87 ("To survive a motion to dismiss, the plaintiffs 'must provide some basis for a court to infer that the alleged

violations were material. For example, a pleader must allege that facts are missing from the statement, identify those facts, *state why they meet the materiality standard* and how the omission caused injury.' " (quoting *Loudon v. Archer–Daniels–Midland Co.*, Del. Supr., 700 A.2d 135, 142 (1997)) (emphasis added)).

**78.** *Crescent/Mach I Partners*, mem. op. at 46 (emphasis added).

**79.** Compl. ¶¶ 24–25.

**80.** *Id,* ¶ 24(a).

**81.** *Id.* ¶ 24(b).

**82.** *Id.* ¶ 24(c).

taur") and that that committee sets or recommends the annual compensation to be paid to defendant Sherren as Centaur's CEO.[83] Fifth, the Proxy Statement failed to disclose that defendant Lufkin was a co-founder of DLJ and that DLJ received a substantial fee as an underwriter for General Cigar's 1997 initial public offering.[84] Sixth, the Proxy Statement failed to disclose that General Cigar's headquarters building in New York City was only partially occupied and listed its value only as its carrying value (cost less depreciation) rather than giving the building's market value.[85] Seventh, and finally, the Proxy Statement failed to disclose the "huge financial benefits" that the Company would reap when the United States' embargo of Cuban products is ultimately removed. As General Cigar owns the trademark rights to seven of the top ten Cuban cigar brands, relaxation of the embargo would likely provide an economic "shot in the arm" for General Cigar.[86]

Orman claims that these omitted facts resulted in the shareholders' vote not being fully informed. The first five disclosure allegations concerning certain defendant directors would, purportedly, have demonstrated to the Unaffiliated Shareholders that "the Board's vote in favor of the merger was tainted by self-interest and self-dealing."[87] The sixth and seventh disclosure allegations would have made the Unaffiliated Shareholders aware that "the Company had significant assets which were not properly considered in establishing the fair value of the stock [they held]."[88]

### 1. Director Barnet

■ Orman alleges it was a material omission that the Proxy Statement did not disclose that Barnet was interested and/or lacked independence "since he is designated to be a director of the surviving corporation and will therefore benefit from the transaction through fees, stock options and other emoluments typically provided to directors of a corporation."[89] As discussed above, Orman has not pled particularized facts that would support a finding that defendant director Barnet either suffered a disabling interest or lacked independence when he voted to approve the merger transaction on January 19, 2000. As a result, there can be no material omission in the failure of the Proxy Statement to mention such nonexistent interest or lack of independence on the part of director Barnet.[90] In addition to Orman's failure to plead facts from which it is reasonable to question Barnet's disinterest and independence, the underlying information that purportedly supported those assertions was, in fact, included in the Proxy Statement.

83. *Id.* ¶ 24(d).

84. *Id.* ¶ 24(e).

85. *Id.* ¶ 24(f).

86. *Id.* ¶ 24(g).

87. *Id.* ¶ 25.

88. *Id.*

89. Compl. ¶ 24(a).

90. *See, e.g., Kahn v. Caporella,* Del.Ch., C.A. No. 13248, mem. op. at 15, Berger, V.C., 1994 WL 89016 (Mar. 10, 1994) (rejecting plaintiff's claim that failure to disclose directors' lack of independence was a material omission when the court found no basis to question those directors' independence); *Michelson v. Duncan,* Del.Ch., 386 A.2d 1144, 1154–55 (1978) (stating that when there was no factual support for the plaintiff's allegations as to the interest of certain directors, the fact that such "interest" was not recited in the proxy materials was a meritless contention), *aff'd in relevant part,* Del.Supr., 407 A.2d 211 (1979).

■ The fact that director Barnet is designated to be a director of the surviving corporation is clearly presented in the Proxy Statement. Under the heading "Directors and Management of the Surviving Corporation," that document recites that "The Merger Agreement provides that the initial board of directors will consist of seven members [including] Bruce Barnet." [91] No purpose would be served by an additional requirement that the Proxy Statement include a statement that as a result of being a director Barnet would "benefit from the transaction through fees, stock options and other emoluments typically provided to directors of a corporation." [92] Since Orman is alleging only that Barnet would receive benefits "typically" received by a director, disclosing that Barnet was to be a director of the surviving company would inform the Unaffiliated Shareholders that he was to receive the benefits typically associated with such a position. Orman's disclosure allegations with regard to director Barnet are, therefore, dismissed.

### 2. Director Solomon

Orman alleges that "Defendant Solomon is also subject to a conflict of interest and/or lacks independence and disinterest since his company, PJSC, stands to make a fee of $3.3 million if the transaction is effectuated." [93] Under the heading "Interest of Certain Persons in the Merger; Certain Relationships," the Proxy Statement expressly states "Peter J. Solomon, whose firm PJSC served as the Company's financial advisor, sits on the Company's board of directors." [94] The Proxy Statement goes on to set plainly forth the fact that PJSC was to receive an estimated $3,300,000 "in connection with the merger." [95] The fact that the Proxy Statement did not also include a statement that the disclosed facts meant that Solomon was in fact "subject to a conflict of interest and/or lacked independence and disinterest" was not a material omission. A board's duty of disclosure does not require it to "engage in 'self-flagellation' and draw legal conclusions implicating itself in a breach of fiduciary duty." [96] Therefore, although "material facts must be disclosed" [97] (and they were with respect to PJSC's fee and Solomon's relationship to that firm), "negative inferences or characterizations of misconduct or breach of fiduciary duty need not be articulated." [98] As a result, the failure to characterize facts concerning Solomon and PJSC's fee as a conflict of interest was not a violation of the Board's duty of disclosure. Orman's disclosure allegations with regard to director Solomon are dismissed.

### 3. Director Bernbach

Orman asserts that the Proxy Statement did not reveal that since 1997 di-

---

91. Defs.' Opening Br., Ex. A at 23 (Proxy Statement); *see also id.*, Ex. A at 39 ("Following the merger, the board will consist of seven directors, with four directors being nominated by the Family, including ... Bruce A. Barnet.").

92. Compl. ¶ 24(a).

93. Compl. ¶ 24(b).

94. Defs.' Opening Br., Ex. A at 23 (Proxy Statement); *see also id.*, Ex. A at 49 (stating Solomon's principal occupation for the previous five years as "Chairman of Peter J. Solomon Company Limited and Peter J. Solomon Securities Company Limited").

95. *Id.*, Ex. A at 29 (Proxy Statement).

96. *Loudon v. Archer–Daniels–Midland Co.*, Del.Supr., 700 A.2d 135, 143 (1997) (quoting *Stroud v. Grace*, Del.Supr., 606 A.2d 75, 84 n. 1 (1992)).

97. *Loudon*, 700 A.2d at 143.

98. *Id.*

rector Bernbach had a consulting contract with General Cigar from which he had been paid $75,000 in 1998 and "additional funds since that date," and that the surviving company would be bound by this contract.[99] General Cigar's Form 10–K and 10–K/A are incorporated into the Proxy Statement by reference and do disclose that contract.[100] The 10–K/A states that "[t]he Company entered into an agreement with John L. Bernbach in 1997 pursuant it [sic] which, Mr. Bernbach provides consulting services to the Company with respect to its international operations. During the Company's 1999 fiscal year, Mr. Bernbach received advisory fees of $56,250 pursuant to such agreement."[101] The Proxy Statement also includes the statement that "[e]mployment and other agreements currently in effect will become obligations of the Surviving Corporation following the merger."[102] Therefore, Bernbach's consulting contract and the continuing obligation of the surviving company under that contract are sufficiently disclosed by the Proxy Statement and Orman's disclosure allegations with regard to director Bernbach are dismissed.

### 4. *Director Sherren*

Orman next alleges "[t]he Proxy Statement fails to disclose that Defendant Cullman Sr. has been the Chairman of the Compensation Committee of the Board of Directors of Centaur Communications Ltd., the body that sets or recommends the annual compensation to be paid to Defendant Sherren in his role as Chief Executive Officer of Centaur."[103] Although I did not reach a conclusion as to whether these facts support an unfavorable inference regarding Sherren's interest and/or independence, all of this information was disclosed in the Proxy Statement or documents incorporated by reference into the Proxy Statement. Sherren's principal occupation during the five years preceding the Proxy Statement was listed as "Chairman and Chief Executive Officer of Centaur Communications Limited."[104] It was disclosed that Cullman Sr. served as a director of Centaur[105] and that "Mr. Cullman [Sr.] is Chairman of the Compensation Committee of Centaur Communications Limited, of which Mr. Sherren is chief executive officer."[106] Because this information *was* disclosed, there is no ma-

---

**99.** *Id.* ¶ 24(c).

**100.** *See* Defs.' Opening Br., Ex. A at 4, 6 (Proxy Statement) (informing shareholders that *"[t]o understand the proposed merger fully and for a more complete description of the terms of the proposed merger, you should read carefully this entire proxy statement, including the annexes to it, and the documents incorporated by reference"* and that "Form 10–K for the fiscal year ended November 27, 1999, as filed with the Commission on February 25, 2000, [is] included in this Proxy Statement." (emphasis in original)). Under the section entitled "WHERE YOU CAN FIND MORE INFORMATION," the Proxy Statement recites "[t]he SEC allows the Company to 'incorporate by reference' information into this proxy statement, which means that the Company can disclose important information by referring you to another document filed sepa-

rately with the SEC. The following documents previously filed by the Company with the SEC are incorporated by reference in this proxy statement and are deemed to be a part hereof: (1) The Company's Annual Report on Form 10–K and Form 10–K/A for the fiscal year ended November 27, 1999." *Id.*, Ex. A at 54 (Proxy Statement).

**101.** *Id.*, Ex. B at 26 (Form 10–K/A).

**102.** *Id.*, Ex. A at 24 (Proxy Statement).

**103.** Compl. ¶ 24(d).

**104.** Defs.' Opening Br., Ex. A at 49 (Proxy Statement).

**105.** *Id.*, Ex. A at 48 (Proxy Statement).

**106.** *Id.*, Ex. B at 27 (Form 10–K/A).

terial omission concerning Sherren. Orman's disclosure allegations with regard to director Sherren are dismissed.

### 5. *Director Lufkin*

 Orman alleges "[t]he Proxy Statement fails to disclose that Defendant Lufkin was a co-founder of Donaldson, Lufkin and Jenrette ("DLJ") and that DLJ received a substantial fee as underwriter for the Company's IPO." [107] In fact, the Proxy Statement informs the shareholders that "Dan W. Lufkin, Chairman [of the Special Committee], was a co-founder of Donaldson, Lufkin & Jenrette." [108] The Proxy Statement also makes clear that although Lufkin "was" a founder of DLJ, he is no longer a member of that investment bank. The Proxy Statement records that Lufkin's "Principal Occupation and Business Experience During the Past Five Years" was that of "Private investor" [109] and that "[e]xcept as otherwise indicated each director has had the same principal occupation during the past five years." [110] The fact that a company Lufkin helped to found, by which he is no longer employed, was an underwriter for General Cigar's 1997 IPO cannot, in my opinion, be considered a material fact that would have altered the total mix of information presented to the Company's shareholders. Orman's disclosure allegations with regard to director Lufkin are dismissed. [111]

Because the facts Orman complains of as being omitted with regard to the individual defendant directors either did not require disclosure or were in fact disclosed, all disclosure allegations concerning the individual director defendants are dismissed. All that remains of Orman's disclosure allegations, therefore, are the omission of the benefit that would redound to the Company when the Cuban embargo is lifted and the omission of the market value of the Company's headquarters building in New York City. These two omissions must be seen to alter the "total mix" of information available to the shareholders in order to meet the materiality standard and to avoid an entire dismissal of Orman's disclosure claims.

### 6. *Cuban Embargo*

 The allegation that it was a material disclosure violation that "[t]he Proxy Statement fail[ed] to disclose the huge financial benefits which the Company would reap when the trade embargo with Cuba is lifted [due to the Company's] exclusive trademark rights to seven of the top ten Cuban cigar brands" [112] is almost laughable. Such an allegation barely rises to the level of unsupported speculation that the Courts of this state have never held must be included in proxy materials. [113] Perhaps in recognition of the baselessness of this particular allegation, Orman did not attempt to defend it either in his briefs or at oral argument. This disclosure claim fails as a matter of law and the defendants'

---

**107.** Compl. ¶ 24(e).

**108.** Defs.' Opening Br., Ex. A at 2 (Proxy Statement).

**109.** *Id.,* Ex. A at 49 (Proxy Statement).

**110.** *Id.,* Ex. A at 50 (Proxy Statement).

**111.** It is apparent from the Proxy Statement that Lufkin was not even employed by DLJ at the time of General Cigar's IPO as the February 28, 1997 IPO in which DLJ participated was within the five-year period during which Lufkin's principal occupation was solely "Private investor."

**112.** Compl. ¶ 24(g).

**113.** *See, e.g., Loudon v. Archer–Daniels–Midland Co.,* Del.Supr., 700 A.2d 135, 145 (1997) ("Speculation is not an appropriate subject for a proxy disclosure.").

motion to dismiss with respect to this alleged omission is, therefore, granted.

### 7. Headquarters Building

■ With respect to the disclosures provided in connection with the Company's headquarters building, Orman acknowledges that the Proxy Statement discloses the carrying value (cost less depreciation) of that asset. He asserts, however, that it was a material omission that the Proxy Statement did not "disclose that the Company's headquarters building at 387 Park Avenue South, which is owned by the Company, consists of 210,000 square feet of office space of which only 25,000 square feet is used by the Company and also fails to disclose the fair market value of such property."[114] The defendants counter that when an asset is fundamental to a company's operations, as opposed to a surplus asset that could readily be sold for market value, the fair market value of such asset need not be included in a company's proxy materials. They maintain that the Company's headquarters building is fundamental to the Company's operations and, as a result, there was no requirement that the Proxy Statement contain fair market value information about that asset.

The defendants correctly point out that in *Citron v. E.I. du Pont de Nemours & Co.*,[115] this Court held that under the facts of that case it was not a material omission when only the book value and not the fair market value of a particular asset was disclosed. This finding was made after the Court determined that the asset was not a surplus asset that could have been sold for cash at fair market value, but was integral to the company in question. *Citron*, however, is readily distinguishable both on its facts and procedural posture from this case.

The decision in *Citron* was reached after a full trial on the merits that was followed by post-trial briefing and further oral argument.[116] Here, the Court does not have the benefit of a fully developed record to assist it in making a determination of whether General Cigar's headquarters building is fundamental to the Company or a surplus asset that could be sold without significantly impairing the Company's ongoing business. The asset in question in *Citron* is also factually distinguishable from the building at issue in this case. The asset at issue in *Citron* was a facility that the Court determined was "not a surplus asset, but was an integral part of the educational and public relations side of [the company's] business."[117] This facility was equated with other operating assets such as factories and major equipment. Additionally, the *Citron* Court knew the appraised value of that facility. This enabled it to calculate that the appraised value was only 1.7% of the fully disclosed book value of the company. These facts led the *Citron* Court to conclude that "[i]n these circumstances, the $4.4 million difference between appraised and book value would have been quantitatively insignificant to a shareholder considering whether to approve the merger."[118] Based on the facts presented to me at this stage of the litigation, I cannot say, as a matter of law, that the building housing the Company's corporate offices is integral to General Cigar's business in the sense that it could be equated to an operating asset. It seems reasonable, at this stage of the litigation, to believe that General Cigar could obtain

---

114. Compl. ¶ 24(f).

115. Del.Ch., 584 A.2d 490 (1990).

116. *Id.* at 492.

117. *Id.* at 503.

118. *Id.*

another location to house its corporate headquarters without adversely affecting the operation of the manufacturing and marketing of the Company's cigars. It is possible, therefore, that the fair market value of that building might be considered material information.

■ At oral argument the defendants suggested, for the first time, that the Proxy Statement did, in a way, disclose the value of the Park Avenue building to the shareholders. They based this assertion on the fact that the projections of income on which the Special Committee's financial advisor, Deutsche Bank, based its valuation of the Company were included in the Proxy Statement. According to the defendants, this is significant because projections of income included lease payments from other non-Company tenants in the Park Avenue building. The defendants reason that since the lease payments from other tenants were included in the income projections and those income projections were used by Deutsche Bank in their valuation of the Company, the "value" of the building was disclosed to the shareholders. Were it determined that the fair market value of the headquarters building was material information that should have been disclosed to the shareholders, I cannot agree with the defendants that this information was disclosed to the shareholders in the manner they propose.

The Proxy Statement does say that the projections of income which were provided by the Company to Deutsche Bank and were used by Deutsche Bank in connection with its January 19, 2000 fairness opinion "[i]nclude[d] income from the Company's headquarters office building." [119] No figures were given, however, either in terms of real dollars or a percentage of income, that showed the significance of these lease payments to that projected income from which a shareholder could have even attempted to determine the "value" of the headquarters building as suggested by the defendants. Additionally, those financial projections "were not prepared by the Company with a view to public disclosure or compliance with presentation and disclosure guidelines established by the SEC or the American Institute of Certified Public Accountants regarding prospective financial information." [120] The Proxy Statement did include audited financial statements, however, and the "Notes to Consolidated Financial Statements" associated with those audited financial statements declared that "[t]he operations of ... 387 PAS, which owns and operates the Company's headquarters building, *were not material* to the Company's results of operations in any of the periods presented." [121] This statement seems to imply both that the building was not, in and of itself, integral to the business of General Cigar nor a significant income-producing asset of the Company. Although upon examination of additional facts at a later stage of litigation it might well be determined that failure to include the fair market value of this asset was not a material omission, based on the specific facts before the Court now it is impossible for me to reach such a conclusion at this time. Therefore, defendants' motion to dismiss as it pertains to this one disclosure allegation cannot be granted on the basis of a determination that information regarding the fair market value of the headquarters building was immaterial.

119. Defs.' Opening Br., Ex. A at 21–22 (Proxy Statement).

120. *Id.,* Ex. A at 21 (Proxy Statement).

121. *Id.,* Ex. A at F–6 (Notes to Consolidated Financial Statements included in Proxy Statement) (emphasis added).

## C. Section 102(b)(7)

The defendants argue that even if I find that Orman has stated a cognizable disclosure claim, the complaint must still be dismissed because all that it alleges is a breach of the duty of care and the Company's certificate of incorporation includes an exculpatory provision adopted pursuant to 8 *Del.C.* § 102(b)(7) that shields General Cigar's directors from personal liability for breaches of the duty of care. Orman responds that he has alleged breaches of the duty of loyalty, liability for which cannot be avoided by the Company's exculpation clause.

Before I can address the parties' contentions as to whether General Cigar's exculpatory provision shields the defendant directors from liability, thereby permitting complete dismissal of the disclosure claims, I must first determine whether the Court's consideration of such a defense is premature in light of the facts and procedural posture of this case. Two recent Delaware Supreme Court decisions specifically addressed the proper timing of this Court's consideration of a defense based on a § 102(b)(7) charter provision. In *Malpiede v. Townson,* the Supreme Court affirmed a Rule 12(b)(6) dismissal of the plaintiffs' due care claim based on a § 102(b)(7) exculpatory provision contained in the defendant corporation's charter.[122] In *Emerald Partners v. Berlin,* the Supreme Court vacated a decision for premature consideration of a § 102(b)(7) pro-

vision in a post trial final judgment.[123] According to the *Emerald III* Court, the trial court improperly found for the defendants based on the existence of a § 102(b)(7) exculpatory provision because it failed first to set out explicitly the Court's findings as to the entire fairness of the challenged transaction.[124] Consideration of the exculpatory provision was held to be premature even though the trial court explicitly determined, after a complete trial on the merits during which both sides were fully able to present all the evidence at their disposal, that even if the transaction was unfair, there was no evidence that in any way showed such unfairness resulted from a breach of the duty of loyalty and that any unfairness could *only* have been due to a breach of the duty of care.[125] Nevertheless, the *Emerald III* Court reiterated *Malpiede's* holding that "if a shareholder complaint unambiguously asserts *only* a due care claim, the complaint is dismissable once the corporation's Section 102(b)(7) provision is properly invoked."[126] The *Malpiede* Court stated, however, that:

[i]n the case of a Rule 12(b)(6) motion, ... if the Section 102(b)(7) charter provision is raised for the first time in the motion or brief in support of the motion, it is a matter outside the pleading. If not excluded by the court, the existence of such matter means that the motion will be converted, by clear force of the pleading rules, into a motion for sum-

---

122. Del.Supr., 780 A.2d 1075, 1079 (2001).

123. Del.Supr., 787 A.2d 85, No. 96, 2001, slip. op., Holland, J. (Nov. 28, 2001) ("*Emerald III*").

124. *Emerald III,* 787 A.2d at 95.

125. *See Emerald Partners v. Berlin,* Del.Ch., C.A. No. 9700, mem. op. at 52–64, Jacobs, V.C., 2001 WL 115340 (Feb. 7, 2001) (stating that it was undisputed and conceded by the plaintiff that the non-affiliated directors were

disinterested, that those directors were independent from an interested director, and proceeding to demonstrate that the facts found by the trial court clearly establish that, *at most,* the plaintiff's duty of loyalty arguments only implicated a possible breach of the duty of care).

126. *Emerald III,* 787 A.2d at 91 (emphasis in original).

mary judgment under [Court of Chancery] Rule 56.[127]

Although the Court must permit discovery when considering a Rule 56 motion for summary judgment, any discovery associated with a matter outside the pleadings considered by the Court may, within the Court's discretion, be limited so as to focus any permitted discovery on the narrow issue presented by that matter.[128]

The defendants in this case first raised the issue of an exculpatory provision, purportedly contained in General Cigar's Certificate of Incorporation at Article Fifth (d), in their brief in support of their motion to dismiss.[129] This being a matter outside the pleadings I have, as instructed by *Malpiede*, converted my consideration of it from a Rule 12(b)(6) standard to a Rule 56 standard. The only discovery relevant to that matter was the very narrow one concerning the existence or authenticity of the Company's exculpation provision. Orman was given the opportunity to conduct limited discovery, but he declined to challenge either the existence or authenticity of General Cigar's exculpatory provision.[130] That provision is, therefore, an undisputed fact that may be considered by the Court. It reads:

> No director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corpora-

tion or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174 of the DGCL or (iv) for any transaction from which the director derived an improper personal benefit.[131]

This provision shields the members of the General Cigar Board from personal monetary liability for a breach of their duty of care to the Company.

Contrary to Orman's suggestion, disclosure claims do not always involve a breach of the duty of loyalty. He incorrectly cites two decisions of this Court, *O'Reilly v. Transworld Healthcare, Inc.*[132] and *Chaffin v. GNI Group, Inc.*[133] as supporting his argument that "[s]o long as the complaint *pleads* a violation of other aspects of the fiduciary duty, such as bad faith or breach of the duty of loyalty, it cannot be dismissed pursuant to § 102(b)(7)."[134] Orman's argument is that merely alleging a violation of the duty of loyalty—whether conclusory in nature or otherwise inadequately pleaded—would preclude dismissal based on an exculpatory charter provision. Neither *O'Reilly* nor *Chaffin* support anything close to Orman's sweeping interpretation of these cases. *O'Reilly* stated that exculpatory provisions adopted pursuant to § 102(b)(7) cannot be the basis for dismissal "where a complaint alleges or pleads facts *sufficient* to support the inference that the disclosure violation . . . implicates

---

127. *Malpiede*, 780 A.2d at 1092.

128. *See id.* at 1091.

129. *See* Defs.' Opening Br. at 23–24.

130. The plaintiff, by a letter to the Court dated December 21, 2001, stated, "Plaintiff does not contest the existence or authenticity of the exculpation provision contained in the Certificate of Incorporation of General Cigar Holdings Inc."

131. Defs.' Opening Br., Ex. C at 10 (Certificate of Incorporation).

132. Del.Ch., 745 A.2d 902 (1999).

133. Del.Ch., C.A. No. 16211–NC, mem. op., Jacobs, V.C., 1999 WL 721569 (Sept. 3, 1999).

134. Pl.'s Br. in Opposition at 21 (emphasis added).

the duty of loyalty."[135] *Chaffin* found that dismissal based on an exculpatory provision was not possible there because "the Court has previously determined that the Complaint *does* state cognizable claims for breach of the duty of loyalty."[136] Put simply, if a complaint *properly* pleads a non-exculpated claim, that claim at least survives a motion to dismiss.

■ The fiduciary duty to disclose material facts does not solely implicate the duty of loyalty, a breach of which results in liability that cannot be avoided by an exculpatory provision. Rather, "[t]he duty of directors to observe proper disclosure requirements derives from the combination of the fiduciary duties of care, loyalty and good faith."[137] The *Malpiede* Court recently observed that a "board's fiduciary duty of disclosure ... [is] not [an] independent dut[y] but the application in a specific context of the board's fiduciary duties of care, good faith, and loyalty."[138] A claim for breach of the duty of disclosure may implicate *only* the duty of care "when the misstatement or omission was made as a result of the directors' good faith, but 'erroneous judgment' concerning the proper scope and content of the disclosure."[139] Furthermore, in *Arnold v. Society for Savings Bancorp, Inc.*, our Supreme Court held that a disclosure claim could be dismissed pursuant to a § 102(b)(7) exculpatory provision when the Court determined that there was no breach of the duty of loyalty and that the

disclosure violation there was consistent with a good faith omission.[140]

Unfortunately for the defendants, however, because Orman has pled facts which make it reasonable to question the independence and disinterest of a majority of the Board that decided what information to include in the Proxy Statement, I cannot say, as a matter of law, that the complaint unambiguously states only a duty of care claim. Therefore, consideration of the effect of General Cigar's exculpatory provision on Orman's ability to recover damages, at this point, is premature.

In addition, because I conclude that it is impossible to say, as a matter of law, that information concerning the fair market value of the Company's headquarters building is immaterial, I cannot currently accept defendants' contention that a fully informed vote of a majority of the Company's Unaffiliated Shareholders ratified any possible breaches of fiduciary duties in connection with the Board's consideration of the challenged merger. If it were later determined that this omission was not material, however, shareholder ratification might become an important issue.

Finally, the pleadings (and reasonable inferences drawn therefrom) are insufficient for me to make a determination with respect to the possible cleansing effect resulting from the actions of General Cigar's Special Committee. The complaint provides no bases upon which I can draw

135. *O'Reilly*, 745 A.2d at 915 (emphasis added).

136. *Chaffin*, mem. op. at 15–16 (emphasis added).

137. *Malone v. Brincat*, Del.Supr., 722 A.2d 5, 11 (1998); *see also Crescent/Mach I Partners, L.P. v. Turner*, Del.Ch., C.A. No. 17455, mem. op. at 43, Steele, V.C., 2000 WL 1481002 (by designation) (Sept. 29, 2000) ("The fiduciary duty of disclosure arises as a subset of a

director's fiduciary duties of loyalty and care." (citing *Malone*, 722 A.2d at 11)).

138. *Malpiede*, 780 A.2d at 1086.

139. *Crescent/Mach I*, mem. op. at 43 (quoting *O'Reilly v. Transworld Healthcare, Inc.*, Del. Ch., 745 A.2d 902, 915 (1999)).

140. Del.Supr., 650 A.2d 1270, 1287–88 & n. 36 (1994).

conclusions confidently as to whether or not the Special Committee's negotiations with Swedish Match were indeed arms-length and indicative of a properly functioning and properly motivated committee. It is also unclear to me at the moment what legal effect, if any, the Company's exculpatory provision would have on the liability of particular defendant directors, if I were to find (at a later stage of this lawsuit) that the Special Committee did, in fact, operate as an independent and properly motivated negotiating body such that any breaches of fiduciary duty by it implicated only the duty of care. These issues must await another day.[141]

## IV. CONCLUSION

For the reasons stated above, I deny defendants' motion to dismiss the fiduciary duty claims in connection with the merger of General Cigar and Swedish Match. I grant in part and deny in part defendants' motion to dismiss the disclosure claims.

An Order accompanies this Opinion.

## *ORDER*

For the reasons assigned in this Court's Opinion entered in this case on this date, it is

ORDERED:

**141.** In light of the fact that Orman's complaint alleged that there was a "no-talk" provision associated with the merger agreement, and even though the issue was not raised in the complaint, I asked counsel to address the question whether either *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1985), or *McMullin v. Beran*, Del.Supr., 765 A.2d 910 (2000), were implicated by the facts of this case. I am satisfied that neither of these cases is implicated here. This conclusion rests on the fact that General Cigar was neither being broken up nor was control being transferred or sold via the challenged merger. Also, the challenged merger

(1) Defendants' motion to dismiss the fiduciary duty claims asserted in plaintiff's complaint is DENIED; and

(2) Defendants' motion to dismiss the disclosure claims asserted in plaintiff's complaint is GRANTED with respect to all such disclosure claims *EXCEPT* the claimed omission of the fair market value of defendant General Cigar Holdings, Inc.'s corporate headquarters building in New York City, NY.

was not merely a step in a series of transactions that have the ultimate result of a change in control or the break up of the company. *See* Defs.' Opening Br., Ex. A at 25 (Proxy Statement) (stating that "[e]xcept as described in this proxy statement, none of the [Cullman Group], Swedish Match, SM Merger Corp. or the Company has any present plans or proposals involving the Company or its subsidiaries which relate to or would result in an extraordinary corporate transaction such as a merger, reorganization, liquidation, sale or transfer of a material amount of assets, or any material change in the Company's corporate structure or business").