# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARK RUDD, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2019-0775-MTZ |
| JEFFREY J. BROWN, NELSON C. CHAN, NORA M. DENZEL, DAVID M. ESKENAZY, ROSS G. LANDSBAUM, ERIK E. PRUSCH, GALEN C. SMITH, and ROBERT D. SZNEWAJS, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION
Date Submitted: August 18, 2020
Date Decided: September 11, 2020

Blake A. Bennett, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Lawrence P. Eagel, W. Scott Holleman, and Garam Choe, BRAGAR EAGEL & SQUIRE, P.C., New York, New York, *Attorneys for Plaintiff.*

Daniel A. Mason and Brendan W. Sullivan, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Lewis R. Clayton, Robert N. Kravitz, and Harris Fischman, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, *Attorneys for Defendants Nelson C. Chan, Nora M. Denzel, David M. Eskenazy, Ross G. Landsbaum, Erik E. Prusch, Galen C. Smith, and Robert D. Sznewajs.*

Ashley R. Altschuler and Ethan H. Townsend, MCDERMOTT WILL & EMERY LLP, Wilmington, Delaware; Jeffrey M. Reisner, Jason D. Strabo, and Paul Ferrillo, MCDERMOTT WILL & EMERY LLP, Los Angeles, California; *Attorneys for Defendant Jeffrey J. Brown.*

**ZURN, Vice Chancellor.**

In a two-step merger, stockholders of a Delaware corporation tendered their shares to a third party. The plaintiff, whose shares were purchased once the tender offer's minimum condition was met, now seeks damages in this class action lawsuit. The plaintiff asserts that the corporation's board members and chief financial officer pursued and disclosed the sale disloyally, to avoid a looming proxy contest and in pursuit of other personal interests. The defendants moved to dismiss for failure to state a claim. In view of the corporation's exculpatory charter provision, I conclude the plaintiff fails to plead that the directors breached their duties of loyalty. I also conclude the plaintiff fails to state a claim against the officer defendant. I grant the motion in its entirety.

## I.    BACKGROUND

On September 27, 2016, Apollo Global Management and affiliates ("Apollo") purchased all the outstanding common shares of Outerwall, Inc. ("Outerwall" or "the Company"), a Delaware corporation headquartered in Bellevue, Washington. Plaintiff Mark Rudd, a former Outerwall stockholder, filed this action post-close, seeking damages from Outerwall's directors and an officer, on the theory that they breached their duties of loyalty in pushing the transaction, agreeing to insufficient consideration, and disclosing the transaction to stockholders. In considering the defendants' motion to dismiss, I draw the facts from the allegations in, and documents incorporated by reference or integral to, the Verified Amended Class

Action Complaint (the "Amended Complaint").[1] I also take judicial notice of Outerwall's certificate of incorporation, which contains an exculpatory provision that bars any claims for monetary damages against the director defendants for duty of care violations committed in their capacities as directors.[2]

### A. Outerwall Encounters Difficulties In 2015, But Management Remains Optimistic.

Outerwall has three distinct business segments. Each of those business segments operates and maintains fully automated self-service kiosks in leading grocery stores and other retailers nationwide: Redbox enables consumers to rent or purchase movies and video games, Coinstar enables consumers to convert their coins into cash, and ecoATM enables consumers to sell certain of their electronic devices for cash. Each of the three segments had differing prospects, but Redbox yielded the most revenue.

Throughout early 2015, Outerwall boasted its strong financial performance and its "position as a leader in automated retail."[3] In February, the Company announced a new $0.30 per share quarterly dividend policy that "reflect[ed]

---

[1] Docket Item ("D.I.") 19 [hereinafter Am. Compl.]; *see Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 869 A.2d 312, 320 (Del. 2004).

[2] *See* D.I. 22, Ex. 4 at 1. Outerwall's charter is extrinsic to the Amended Complaint. The Court may nonetheless consider the charter at the pleadings stage because it is subject to judicial notice and because the plaintiff does not contest its existence or authenticity. *See Malpiede v. Townson*, 780 A.2d 1075, 1090 (Del. 2001).

[3] Am. Compl. ¶ 53.

confidence in Outerwall's financial strength and long-term prospects."[4] In May, Outerwall touted its consolidated revenue for the first quarter of 2015 as "the highest quarter in the [C]ompany's history"[5] and expressed that those results demonstrated "continued confidence in Outerwall's long-term prospects and future cash flow."[6]

On July 30, just as Outerwall reported positive second quarter results,[7] Outerwall announced that its board of directors (the "Board") had appointed Defendant Erik Prusch as chief executive officer ("CEO"). Before joining Outerwall, from 2009 to 2014, Prusch served as the CEO of three companies and oversaw the sale of two of them. One publication dubbed Prusch "the Band-Aid CEO" and described him as "[t]he leader you want to hold things together when it's time to sell."[8] Prusch also served as a member of the Board, alongside defendants Nelson Chan, chairman; Nora Denzel; David Eskenazy; Ross Landsbaum; and Robert Sznewajs.

By October, the tides began to shift. Outerwall experienced "the lowest theatrical box office in four years for Redbox titles," and the Company's third-

---

[4] *Id.* ¶ 54.

[5] *Id.* ¶ 55.

[6] *Id.* ¶ 57.

[7] The Company's second quarter results reflected growth in areas including core adjusted EBITDA from continuing operations, core diluted EPS from continuing operations, and free cash flow.

[8] *Id.* ¶ 72.

quarter Redbox revenue was lower than expected.[9]  Still, Prusch assured the public of Outerwall's "ability to drive the bottom-line" and that the Company would continue to "drive to top-line performance."[10]

On October 29, Outerwall announced that it had entered into an agreement to acquire Gazelle, Inc., for approximately $18 million.  Gazelle was an e-commerce company that allowed customers to buy and sell used smartphones online.  The Gazelle acquisition was intended to make ecoATM profitable.

On December 7, Outerwall updated its financial expectations for that year to reflect lower expected Redbox segment revenue for the fourth quarter.  The revision had a "short-term stock price impact," and Outerwall's stock price briefly dropped.[11] Despite this, analysts and management remained optimistic.  One analyst report commented that "[t]he poor Redbox results were mainly due to the worst box office in four years, and not due to other factors."[12]  Defendant Galen Smith, Outerwall's chief financial officer, commented that Redbox remained a "compelling business"

---

[9] *Id.* ¶ 75.  Redbox video rentals typically fluctuated, depending on factors such as the box office titles available in any given quarter.

[10] *Id.*

[11] *Id.* ¶ 80.

[12] *Id.*

and that Outerwall was committed to "position[ing] Redbox for continued success."[13]

On February 4, 2016, Outerwall reported its fourth quarter and year end results for 2015. Those financial results reflected further decline in Redbox revenue,[14] an increase in Coinstar and ecoATM revenue, and a mild increase in free cash flow. Management's optimistic rhetoric continued. Prusch commented that Outerwall delivered "solid 2015 results . . . despite challenging headwinds that continued to impact Redbox."[15] Smith made similar comments.

### B. An Activist Investor Acquires A Significant Position In Outerwall And Expresses Distaste With Management.

Throughout early 2016, non-party Engaged Capital, LLC ("Engaged") amassed significant holdings of Outerwall stock. According to the Amended Complaint, Engaged is an activist investor known for launching "aggressive campaigns with respect to numerous companies to force change" and for securing appointees on the boards of the companies in which it invests.[16]

On February 8, Engaged filed a Schedule 13D-9 with the SEC disclosing that it owned 14.1 percent of Outerwall's common stock. The same day, Engaged

---

[13] *Id.* ¶ 81.

[14] The Amended Complaint does not specify whether or by how much Redbox beat revised guidance.

[15] *Id.* ¶ 83.

[16] *Id.* ¶ 90.

requested a meeting with Chan. Chan could not meet with Engaged until February 29.

On February 18, Engaged filed an amended Schedule 13D disclosing that it now owned 14.6 percent of Outerwall's common stock. Engaged became Outerwall's second largest stockholder. Attached to the amended Schedule 13D was a letter to the Board dated the same day in which Engaged expressed its frustration with Chan's unwillingness to meet promptly, "given the size of [Engaged's] investment and [Outerwall's] weak stock price performance."[17] The letter further stated: "[W]e are left with no choice but to make our concerns publicly known to the full Board as well as our fellow shareholders."[18]

Accompanying the letter was a slide deck in which Engaged explained its view that the market was undervaluing Outerwall and that "[p]oor corporate governance, strategy, and capital allocation have led to today's impaired valuation."[19] It criticized "persistent failures by the Board and management team," including the Board's "penchant for chasing growth" despite multiple unsuccessful growth ventures.[20] In view of these leadership failures, Engaged stated: "[T]he Board MUST publicly announce a parallel process to explore strategic alternatives

---

[17] Id. ¶ 95.

[18] Id.

[19] Id. ¶¶ 97–98.

[20] Id. ¶¶ 99–100.

6

for the entire business."[21]  It warned:  "If the Board continues to fail to act in the best interests of the shareholders, we will give shareholders the opportunity to hold the Board accountable at the upcoming annual meeting by seeking to replace multiple directors."[22]

### C. The Board Begins The Sale Process, Enters Into A Cooperation Agreement With Engaged, And Reports Financial Results For The First Quarter Of 2016.

Shortly after receiving Engaged's letter, on March 4, the Board met with Outerwall management to discuss retaining Morgan Stanley & Co. LLC ("Morgan Stanley") as a financial advisor.  On March 14, Outerwall announced that its Board had initiated a process "to explore strategic and financial alternatives to maximize shareholder value."[23]

In the months that followed, Morgan Stanley contacted fifty-three potential bidders, including both financial and strategic buyers.  Forty-two parties expressed interest in further evaluating a potential transaction.  Outerwall executed non-disclosure agreements with a number of parties in order to facilitate due diligence.

As due diligence progressed, on April 12, Outerwall announced that it had entered into a Cooperation Agreement with Engaged.  Engaged agreed not to launch

---

[21] *Id.* ¶ 104.

[22] *Id.* ¶ 106.

[23] *Id.* ¶ 111.

a proxy fight and to support Outerwall's Board nominees at the upcoming stockholder meeting in exchange for the ability to appoint one Board member effective immediately. Pursuant to this agreement, Engaged appointed Defendant Jeffrey Brown to the Board (together with Chan, Prusch, Denzel, Eskenazy, Landsbaum, and Sznewajs, the "Director Defendants," and together with Smith, "Defendants"). Outerwall also agreed to expand the Board from seven to nine seats, and to allow Engaged to appoint directors to those two vacant seats on or before August 1, 2016. According to the Amended Complaint, the August 1 date essentially provided a deadline for the Board to negotiate a sale or be swamped by Engaged appointees.[24]

On April 28, Outerwall reported its financial results for the first quarter of 2016. The Company reported "decreasing year-over-year revenues" but sequential gains in the Redbox segment.[25] It also reported increased revenues in the Coinstar and ecoATM segments. Smith and Prusch made optimistic comments, explaining plans to further cut costs and to continue creating efficiencies. Smith explained that the second quarter of 2016 would be successful for Redbox, as Outerwall expected box office to be forty-three percent higher year over year.

---

[24] *Id.* ¶ 119. Plaintiff does not allege that Engaged appointed an eighth or ninth director.
[25] *Id.* ¶ 122.

### D. The Board Resolves To Sell Outerwall To Apollo.

Throughout May 2016, Outerwall received numerous acquisition proposals ranging from $27 to $57 per share in cash. One bidder, who offered $51 per share but wished to acquire only one of Outerwall's business segments rather than the entire enterprise, withdrew from the process. Three potential bidders emerged as particularly attractive to Outerwall. Apollo submitted an indication of interest in the range of $50 to $55 per share. Company A[26] submitted an indication of interest in the amount of $48 per share. And Company B[27] submitted an indication of interest in the range of $55 to $57 per share.

Around June 24, Apollo submitted a bid of $50 per share. Company A submitted a bid of $48 per share. And Company B submitted a bid that ranged between $43 and $45 per share. Thereafter, the Board decided to terminate deal discussions with Company B. The Board further instructed Morgan Stanley to communicate to Apollo and Company A that Outerwall wished to complete its review of strategic alternatives in July.

On July 21, Apollo and Company A submitted unchanged offers of $50 and $48 per share, respectively. Apollo's offer sought to restrict Outerwall's ability to

---

[26] The Amended Complaint refers to this potential bidder as "Company A." *Id.* ¶ 130. This decision does the same.

[27] The Amended Complaint refers to this potential bidder as "Company B." *Id.* This decision does the same.

pay dividends to stockholders. Within the next three days, Company A increased its offer from $48 to $50.32 per share. Apollo then increased its offer from $50 to $51.75 per share and agreed to permit a one-time dividend payment. Apollo then increased its offer even further to $52 per share. Company A did the same, increasing its offer to $50.82 per share.

On July 24, the Board resolved to sell Outerwall to Apollo. The next day, on July 25, Outerwall announced that it had entered into an agreement with Apollo pursuant to which Apollo would acquire all of the outstanding shares of Outerwall common stock for $52 per share through an all-cash tender offer and subsequent short-form merger (the "Acquisition").

On August 5, Outerwall filed a Schedule 14D-9 with the SEC (the "Proxy").[28] The Proxy disclosed three sets of financial projections and assumptions underlying each: the "Core Case" projections, the "Unrisked Strategy Case" projections, and the "Downside Case" projections.[29] Of these three, the Proxy explained, "management's best estimate of the Company's future financial performance for purposes of long-term strategic and financial planning and evaluation of strategic

---

[28] The Proxy was amended seven times. The last amendment was made on September 16, 2016. This decision uses the term "Proxy" to refer collectively to the original disclosure and its subsequent amendments.

[29] *Id.* ¶ 164.

and financial alternatives was the Core Case."[30]  The Core Case had been presented

to the Board in March 2016 "for approval to be used by Morgan Stanley to consider

in the bank's analyses concerning a potential deal for the sale of the Company."[31]

Also on August 5, Apollo began the tender offer, which was originally

scheduled to expire on September 1.  But on August 31, Apollo announced that it

would extend the tender offer period to September 22.  On September 23, Apollo

and Outerwall announced that the tender offer had been completed and that the

Acquisition received support from 69.3 percent of outstanding shares.  This was

enough to satisfy the tender offer's minimum condition.  The Acquisition closed on

September 27, 2016.

Meanwhile, on September 21, another Outerwall stockholder filed an action

in this Court seeking to inspect the Company's books and records under

8 *Del. C.* § 220 (the "Section 220 Action").[32]  The plaintiff in the Section 220 Action

sought to "investigate potential breaches of fiduciary duties by the members of the

Company's Board of Directors or others" in connection with the Acquisition and

---

[30] *Id.* ¶ 174.

[31] *Id.* ¶ 166.

[32] *Dal Ben v. Outerwall, Inc.*, C.A. No. 12763-CB (Del. Ch. Sept. 21, 2016) [hereinafter Section 220 Compl.].  I take judicial notice of the Section 220 Action pursuant to Rule 202(d)(1)(C) of the Delaware Rules of Evidence.  D.R.E. 202(d)(1)(C) ("The court may, without request by a party, take judicial notice of . . . the records of the court in which the action is pending and of any other court of this State or federal court sitting in or for this State.").

specifically alleged that "the Company's management . . . secured for themselves lucrative continuing employment in the post-merger, private company."[33]   On a paper record, Chancellor Bouchard entered judgment against the plaintiff in the Section 220 Action, holding that the plaintiff failed to establish a credible basis to suspect wrongdoing.[34]

### E.    Plaintiff Files This Action In 2019.

Plaintiff filed this class action lawsuit on September 26, 2019, on behalf of himself "and all persons who owned shares of Outerwall common stock immediately prior to the completion of the Acquisition on September 27, [2016]."[35]   Plaintiff alleged that Defendants breached their fiduciary duties in connection with the sale process.

After Defendants moved to dismiss the original complaint,[36] Plaintiff filed the Amended Complaint on March 4, 2020, as permitted by Court of Chancery Rule 15(aaa).   The Amended Complaint asserts one Count against all Defendants for breach of fiduciary duty.   Count I first claims that Defendants "failed to take

---

[33] Section 220 Compl. ¶ 8.A.

[34] D.I. 22, Ex. 23 at 50–66.  The Chancellor also noted the stockholder in that case made no "effort to explain how [board members] could legitimately be the subject of a nonexculpated claim for breach of fiduciary duty in connection with approving the transaction."  *Id.* at 64.

[35] D.I. 1 ¶ 20; *see also* Am. Compl. ¶ 20.

[36] D.I. 9; D.I. 11.

reasonable efforts to maximize the value of the Company for the benefit of Outerwall's public stockholders, instead accepting grossly inadequate consideration."[37] Count I also claims that Defendants "failed to disclose material information concerning the Acquisition, thus rendering the Company's stockholders unable to make an informed decision whether to tender their shares and whether to seek appraisal."[38]

Plaintiff challenges the Acquisition on narrow grounds. As established at oral argument, Plaintiff does not assert that the sale process was defective.[39] Instead, he asserts that the defendants decided to sell the Company out of self-interest, and maintains that the $52 per share tender offer price was inadequate.[40]

Plaintiff also challenges the Company's disclosures on the ground that they contained material misrepresentations or omissions concerning Outerwall's financial projections. Specifically, Plaintiff asserts that the Proxy misleadingly "portrayed the Core Case as most accurately reflecting Outerwall's management's view as to the likeliest of scenarios for the Company's financial future"[41] because it contained incorrect assumptions. Plaintiff also asserts that the Proxy was materially

---

[37] Am. Compl. ¶ 207.

[38] *Id.* ¶ 208.

[39] D.I. 40 at 50–51, 53.

[40] *Id.*

[41] D.I. 29 at 42 [hereinafter Pl.'s Answering Br.].

misleading because "it only included a summary of Outerwall's consolidated projections"[42] and failed to provide "segment-by-segment information."[43]

Defendants moved to dismiss the Amended Complaint on March 18.[44] The parties fully briefed that motion by July 10.[45] I heard oral argument on August 6,[46] and the parties completed supplemental submissions by August 18.[47]

## II. ANALYSIS

Defendants moved to dismiss pursuant to Court of Chancery Rule 12(b)(6). The standard for dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established.[48] In considering Defendants' Motion, I must accept as true all well pleaded facts and inferences that can reasonably be drawn therefrom. "[D]ismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[49] A motion to dismiss will be granted only if

---

[42] *Id.* at 45.

[43] *Id.* at 46.

[44] D.I. 20.

[45] D.I. 21; Pl.'s Answering Br.; D.I. 31.

[46] D.I. 40.

[47] D.I. 43; D.I. 44.

[48] *See Feldman v. Cutaia*, 2006 WL 920420, at *7 (Del. Ch. Apr. 5, 2006).

[49] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 897 (Del. 2002) (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

"it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading."[50]

Defendants have pressed three grounds for dismissal. They first assert that Plaintiff's 2019 suit based on the 2016 Acquisition is barred by laches. They next assert that because a "fully informed, uncoerced majority of the disinterested stockholders" accepted Apollo's tender offer, dismissal is warranted under *Corwin v. KKR Financial Holdings LLC*.[51] Finally, they assert that Plaintiff has failed to plead a non-exculpated fiduciary duty claim against the Director Defendants, and any claim at all against Smith. Accepting Plaintiff's allegations as true and drawing all reasonable inferences therefrom, and assuming that Plaintiff's claim is timely and that Outerwall stockholders were not fully informed when they tendered their shares, I still conclude that Plaintiff has failed to plead viable claims against each Defendant.

Outerwall's directors are protected by an exculpatory charter provision under 8 *Del. C.* §102(b)(7). "Delaware courts have consistently held that the adoption of a charter provision, in accordance with Section 102(b)(7), bars the recovery of monetary damages from directors for a successful shareholder claim that is based

---

[50] *Feldman*, 2006 WL 920420, at *7.

[51] 125 A.3d 304, 306 (Del. 2015). "The acceptance of a first-step tender offer by fully informed, disinterested, uncoerced stockholders representing a majority of a corporation's outstanding shares in a two-step merger . . . has the same cleansing effect under *Corwin* as a vote in favor of the merger by a fully informed, disinterested, uncoerced stockholder majority." *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 747 (Del. Ch. 2016).

exclusively upon establishing a violation of the duty of care."[52]  Thus, in actions for monetary damages "against the directors of Delaware corporations with a Section 102(b)(7) charter provision, a shareholder's complaint must allege well-pled facts that, if true, implicate breaches of loyalty or good faith."[53]

The presence of an exculpatory charter provision does not alter the Court's scrutiny of the Acquisition.  Because Outerwall stockholders received cash for their shares, the Acquisition is presumptively subject to enhanced scrutiny under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*[54]  Under *Revlon*, the Court must examine whether the directors of the corporation have performed their fiduciary duties "in the service of a specific objective: maximizing the sale price of the enterprise."[55]  "[D]irectors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there."[56]

---

[52] *Emerald P'rs v. Berlin*, 787 A.2d 85, 91 (Del. 2001).

[53] *Id.* at 92.

[54] 506 A.2d 173, 183 (Del. 1986); *see Volcano*, 143 A.3d at 737 ("Because [the] stockholders received cash for their shares, the *Revlon* standard of review presumptively applies.").

[55] *Malpiede*, 780 A.2d at 1083 (citing *Revlon*, 506 A.2d at 183); *see Revlon*, 506 A.2d at 183 (explaining that in the sale of control context, the duty of loyalty requires "the maximization of the company's value at a sale for the stockholders' benefit"); *see also Paramount Commc'ns Inc. v. QVC Network, Inc.*, 637 A.2d 34, 44 (Del. 1994) ("In the sale of control context, the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders—and they must exercise their fiduciary duties to further that end.").

[56] *In re Answers Corp. S'holders Litig.*, 2011 WL 1366780, at *3 (Del. Ch. Apr. 11, 2011).

"*Revlon* neither creates a new type of fiduciary duty in the sale-of-control context nor alters the nature of the fiduciary duties that generally apply."[57]  Rather, it is "a context-specific articulation of the directors' duties."[58]  "A corporate board's failure to obtain the best value for its stockholders may be the result of illicit motivation (bad faith), personal interest divergent from shareholder interest (disloyalty) or a lack of due care."[59]  "Although the *Revlon* doctrine imposes enhanced judicial scrutiny of certain transactions involving a sale of control, it does not eliminate the requirement that plaintiffs plead sufficient facts to support the underlying claims for a breach of fiduciary duties in conducting the sale."[60]

Accordingly, even under *Revlon* scrutiny, an exculpatory charter provision shields defendant directors from monetary liability where "the underlying claims for a breach of fiduciary duties in conducting the sale" are based only on duty of care violations.[61]  Thus, plaintiffs challenging a transaction under *Revlon* and seeking

---

[57] *Malpiede*, 780 A.2d at 1083.

[58] *Kahn v. Stern*, 183 A.3d 715, 2018 WL 1341719, at *1 n.3 (Del. Mar. 15, 2018) (TABLE).

[59] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 731 (Del. Ch. 1999).

[60] *Malpiede*, 780 A.2d at 1083–84.

[61] *Id.* at 1084, 1094–95.

17

monetary damages, like Plaintiff here, must plead facts sufficient to state a non-exculpated fiduciary duty claim.[62]

One way to state a non-exculpated claim against a director protected by a 102(b)(7) provision is to plead facts for each director "supporting a rational inference that the director harbored self-interest adverse to the stockholder's interest, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[63] The same standard governs disclosure claims. "[W]hen asserting a disclosure claim for damages against directors post-close, a plaintiff must allege facts making it reasonably conceivable that there has been a non-exculpated breach of fiduciary duty by the board in failing to make a material disclosure."[64] "Where, as here, an exculpation provision under 8 *Del. C.* § 102(b)(7) shields a board from duty-of-care claims, this means a plaintiff must demonstrate that a majority of the board was not disinterested or independent,

---

[62] *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1175 (Del. 2015); *see also Lukens*, 757 A.2d at 732–34.

[63] *Cornerstone*, 115 A.3d at 1179. The Delaware Supreme Court recently recognized that a plaintiff can state a claim under *Revlon* by pleading that a conflicted fiduciary failed to disclose "critical information" to the board or that the board failed to oversee a conflicted fiduciary sufficiently throughout the sale process. *Kahn*, 2018 WL 1341719, at *1 n.4. Plaintiff does not pursue either of these theories.

[64] *Nguyen v. Barrett*, 2016 WL 5404095, at *3 (Del. Ch. Sept. 28, 2016).

or that the board was otherwise disloyal because it failed to act in good faith, in failing to make the material disclosure."[65]

Plaintiff asserts that each Defendant was conflicted because he or she lacked disinterestedness or independence.[66] Plaintiff does not assert that Defendants acted in bad faith.[67] And for Smith's part, as an officer rather than an exculpated director, Plaintiff does not assert that he acted with gross negligence or otherwise breached his duty of care.[68] Plaintiff's theories of conflict are not adequately pled.

### A. Plaintiff Has Failed To Plead That A Looming Proxy Fight Rendered The Director Defendants Conflicted.

Plaintiff first asserts that the Director Defendants were conflicted because of their "desire to avoid ouster at the hands of Engaged" and the reputational harm that would come with it.[69] Delaware courts "have expressed reluctance to find" that directors are conflicted "simply because they operate under the threat of a proxy contest."[70] In *In re Lukens Inc. Shareholders Litigation*, for example, the Court

---

[65] *Id.*

[66] Pl.'s Answering Br. at 29–38.

[67] D.I. 40 at 56–57.

[68] As an officer, Smith is not protected by Outerwall's exculpatory charter provision and may therefore be held monetarily liable for a breach of the duty of care. *See Morrison v. Berry*, 2019 WL 7369431, at *22 (Del. Ch. Dec. 31, 2019).

[69] Pl.'s Answering Br. at 29.

[70] *In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *14 (Del. Ch. Nov. 20, 2018); *see In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *12 (Del. Ch. Jan. 3, 2013) ("The possible initiation of a proxy contest is not sufficient . . . to create a disqualifying interest."); *see also In re MeadWestvaco S'holders Litig.*, 168 A.3d 675, 683 & n.33 (Del. Ch. 2017)

19

rejected the plaintiffs' assertion that the directors who approved the relevant merger were improperly motivated because of "the possibility of a proxy contest at the . . . annual stockholder meeting."[71]  The Court observed:

> [T]here is no logical force to the suggestion that otherwise independent, disinterested directors of a corporation would act disloyally or in bad faith and agree to a sale of their company 'on the cheap' merely because they perceived some dissatisfaction with their performance among the stockholders or because of the possibility that a third of their number might face opposition for reelection at the next annual stockholders meeting.[72]

The threat of a looming proxy contest might inform the inference of conflict at the pleading stage "when coupled with other pled facts."[73]  Plaintiff points to three cases finding conflict in the context of a proxy contest.[74]  First, in *In re Tangoe, Inc.*

---

(noting that the plaintiffs' reluctance to argue that a "looming proxy fight . . . prevented the Board from appropriately conducting [its] duties" was "not surprising" because "Delaware law routinely rejects the notion that a director's interest in maintaining his office, by itself, is a debilitating factor" (quoting *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 175 (Del. Ch. 2005))); *In re TriQuint Semiconductor, Inc. S'holders Litig.*, 2014 WL 2700964, at *3 (Del. Ch. June 13, 2004) (denying a motion to expedite proceedings and rejecting the plaintiffs' argument that the company's directors were conflicted because an investor had launched a proxy contest to replace six of the eight members of the board).

[71] 757 A.2d at 729.

[72] *Id.*

[73] *Tangoe*, 2018 WL 6074435, at *14.

[74]  Plaintiff relies on several other cases, but none of them involved allegations of a proxy contest.  Pl.'s Answering Br. at 30–31; *see Chen v. Howard-Anderson*, 87 A.3d 648 (Del. Ch. 2014) (involving no allegation of a proxy contest); *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 64–65 (Del. Ch. 2014) (same), *aff'd sub nom. RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015); *In re El Paso Corp. S'holders Litig.*, 41 A.3d 432, 439 (Del. Ch. 2012) (same).  They are therefore inapposite.

*Shareholders Litigation*, the Court denied a motion to dismiss where the plaintiffs alleged the relevant directors were conflicted.[75] There, the company was swept up in a "regulatory storm" when it was forced to restate its financial results.[76] The restatement "had profoundly affected the [b]oard's and management's compensation and incentives."[77] "[S]o long as the [r]estatement remained unfinished,"[78] the directors were unable to receive awards under the company's existing equity incentive plan. The board caused the company to enter into equity award replacement compensation agreements with each director, granting significant benefits upon a change of control transaction regardless of whether the restatement was completed.[79] The plaintiffs asserted that the directors forced an undervalued sale of the company in the midst of the restatement, in light of their new compensation agreements, because "a sale was the most likely means by which [they] would receive generous [compensation]."[80] The Court found that the compensation agreements "provided reasonably conceivable material benefits" to the directors, thereby rendering them conflicted.[81]

---

[75] *Tangoe*, 2018 WL 6074435, at *14.

[76] *Id.* at *4.

[77] *Id.* at *5.

[78] *Id.* at *13.

[79] *Id.* at *5.

[80] *Id.* at *13.

[81] *Id.*

Building on this foundational conflict, the Court also considered the looming threat of a proxy contest. Shortly before the contested merger was announced, the board received a letter from a group of stockholders warning that, "absent a prompt transaction, they would seek to replace the Board with 'new directors.'"[82] Another group of stockholders sent a similar letter one week later.[83] The Court observed that the threat of a looming proxy contest "t[ook] on a greater measure of relevance at the motion to dismiss stage" in light of, among other things, the preexisting conflict that had been adequately pled.[84]

Second, in *Kosseff v. Ciocia*, then-Master Glasscock denied a motion to dismiss where it was alleged that the Board violated its duty of care in approving an agreement that neutralized the threat of a proxy contest, but also sold the company's assets to an insider board member and his management confreres.[85] A group of concerned stockholders solicited proxies with the goal of expanding the number of seats on the board and replacing the company's CEO.[86] The company quickly entered into an agreement with those stockholders and the board acceded to their

---

[82] *Id.* at *8.

[83] *Id.*

[84] *Id.* at *14.

[85] 2006 WL 2337593, at *7–8 (Del. Ch. Aug. 3, 2006) (Master's Report).

[86] *Id.* at *1.

demands.[87]  But in exchange, the CEO and his management allies were permitted to purchase company offices that yielded a significant portion of the company's overall revenue.[88]  In considering whether the agreement was protected by safe harbor, the Master took issue not only with the board's avoidance of the proxy contest, but also with its "rubber-stamp[]" approval of the agreement that favored the CEO.[89]  The sale of company offices, not the proxy contest, formed the gravamen of the lawsuit and supported the fiduciary duty claim asserted.

And third, in *In re PLX Technology Inc. Stockholders Litigation*, the plaintiffs "surviv[ed] [a motion to dismiss] by the skin of their teeth"[90] in alleging that the Board began to explore a sale after two successive and aggressive activist campaigns.[91]  When the first activist investor emerged, it "publicly accused the board and management of mismanagement" and "argued that the solution was to sell the company."[92]  The board initially resisted the activist's demands, so the activist announced that it would launch a proxy contest and filed proxy solicitation

---

[87] *Id.*

[88] *Id.*

[89] *Id.* at *8.

[90] C.A. No. 9880-VCL, at 6 (Del. Ch. Sept. 3, 2015) (TRANSCRIPT).  I consider this transcript ruling because Plaintiff relies on it, even though such rulings generally have no precedential value.  *Day v. Diligence, Inc.*, 2020 WL 2214377, at *1 (Del. Ch. May 7, 2020).

[91] C.A. No. 9880-VCL, at 47–48.

[92] *Id.* at 7.

materials.[93]  Weeks later, the company announced that it had entered into a merger agreement.[94]  That transaction was eventually terminated in light of regulatory pressure.[95]

One month later, a second activist investor acquired a significant position and "publicly advocated that the board should sell the company."[96]  Just as it had with the first activist, the board initially resisted.  It rejected an offer to purchase the company, "saying it 'substantially' undervalued the company" because the company's standalone value was much higher.[97]  On receiving this news, the second activist increased its holdings, "sent a barrage of emails and letters to board members, threatened litigation, and threatened a proxy contest."[98]  And again, just as it had with the first activist, the board reversed course and announced that it had formed a special committee to explore a sale of the company.[99]  Ultimately, the board sold the company at a price lower than what it had previously said was the company's standalone value.

---

[93] *Id.* at 8.

[94] *Id.*

[95] *Id.*

[96] *Id.* at 9.

[97] *Id.*

[98] *Id.* at 9–10.

[99] *Id.* at 10–11.

The Court found that, "by the slimmest of margins,"[100] the plaintiff had been able to plead that certain members of the board decided to sell the company "in part" because of the activists' "badgering."[101]  What "tip[ped] the line" for the Court was the board's "double back-and-forth flip-flop" on the decision to sell as soon as an activist threatened a proxy contest, coupled with the fact that the board "end[ed] up at a price below where they took [a] stance on [the company's] standalone [value]."[102]

*Tangoe*, *Kosseff*, and *PLX* found conflict in board decisions made in the shadow of a proxy contest, but only where those decisions bore other indicia of gross negligence or disloyalty.  Plaintiff's allegations offer no such meat on the bone.  There is no allegation that the Director Defendants revised their own compensation structures such that they would benefit in the short term from a change in control transaction, as in *Tangoe*.  There is no allegation that the Director Defendants thoughtlessly approved a self-dealing transaction with Engaged, as in *Kosseff*.  And there is no allegation that the Director Defendants "double flip-flopped" after successive activist campaigns and ultimately decided to sell the company at a price less than its standalone value, as in *PLX*.  The Amended Complaint contains no facts

---

[100] *Id.* at 46.

[101] *Id.* at 46–47.

[102] *Id.* at 47–48.

beyond the threat of a looming proxy contest that would make it reasonably conceivable that the Director Defendants were conflicted.

The allegations in the Amended Complaint boil down instead to the bare-bones conflict theory rejected in *Lukens*. In *Lukens*, the plaintiffs asserted "in a wholly conclusory fashion" that the directors' goal was to "avoid[] an upcoming . . . annual meeting at which they would have to report and account for their mismanagement resulting in over two consecutive years of losses and face a possible proxy contest."[103] Similarly here, Plaintiff alleges in a wholly conclusory fashion that the Director Defendants "feared a costly and embarrassing ouster" and that "to avoid such a disastrous outcome, the Board immediately turned its attention toward selling the Company."[104] This is precisely the sort of allegation that the Court in *Lukens* found to have "no logical force."[105]

Given this Court's reluctance to find that the mere threat of a proxy contest renders directors conflicted,[106] Plaintiff's allegation that the Director Defendants

---

[103] 757 A.3d at 729.

[104] Am. Compl. ¶ 109; *see also id.* ¶ 91 ("Because of Engaged's notoriety and the very public nature of its prior fights, the Board members were keenly aware that they would have to succumb to Engaged's wishes else risk an ouster from the Board."). This conclusory statement lacks logic as applied to Brown; there is no basis to infer he would fear ouster by the stockholder who appointed him. Plaintiff's argument that Brown was conflicted because he was an Engaged appointee is addressed below.

[105] 757 A.3d at 729.

[106] *Tangoe*, 2018 WL 6074435, at *14; *MeadWestvaco*, 168 A.3d at 683 & n.33; *TriQuint*, 2014 WL 2700964, at *3; *Novell*, 2013 WL 322560, at *12.

were conflicted solely because they initiated the sale process after Engaged threatened a proxy contest is insufficient as a matter of law to plead a non-exculpated breach of fiduciary duty. Plaintiff's failure to adequately plead a non-exculpated breach of fiduciary duty based on self-interest or lack of independence similarly compels dismissal of Plaintiff's disclosure claim. Even assuming that the challenged disclosures were deficient, Plaintiff "has failed to plead facts such that it is reasonably conceivable that the allegedly [deficient] disclosure[s] [were] made by the board disloyally or in bad faith, as is required to sustain this claim post-close."[107]

## B. Plaintiff Has Failed To Plead That Prusch, Brown, And Smith Were Conflicted.

Plaintiff also asserts that Prusch, Brown, and Smith were conflicted for reasons unrelated to the looming threat of a proxy contest. Plaintiff first asserts that Prusch was conflicted "as a result of the hefty payday he stood to receive from the vesting and acceleration of his equity awards as well as from other golden parachute-related payments."[108] The Amended Complaint alleges that Prusch "secured material financial benefits for completing the Acquisition" totaling $13.6 million.[109] That amount included sums Prusch received upon cashing out certain shares of

---

[107] *Nguyen*, 2016 WL 5404095, at *5.

[108] Pl.'s Answering Br. at 37.

[109] Am. Compl. ¶ 151.

Outerwall stock as well as "the acceleration of vested and unvested stock options, change in control payments, and other benefits."[110]

Delaware law recognizes that "[a] director who is also a shareholder of his corporation is more likely to have interests that are aligned with the other shareholders of that corporation as it is in his best interest, as a shareholder, to negotiate a transaction that will result in the largest return for all shareholders."[111] Delaware courts have thus "routinely held that an interest in options vesting does not violate the duty of loyalty."[112] More generally, "[t]he possibility of receiving change-in-control benefits pursuant to pre-existing employment agreements does not create a disqualifying interest as a matter of law."[113]

In light of these principles, it is not reasonably conceivable that Prusch was conflicted by virtue of the benefits he received from the Acquisition. Absent facts

---

[110] *Id.* ¶ 16.

[111] *Orman v. Cullman*, 794 A.2d 5, 27 n.56 (Del. Ch. 2002); *see also In re Mobile Commc'ns Corp. of Am., Inc. Consol. Litig.*, 1991 WL 1392, at *9 (Del. Ch. Jan. 7, 1991) (observing that directors' equity ownership created "powerful economic (and psychological) incentives to get the best available deal"), *aff'd*, 608 A.2d 729 (Del. 1992).

[112] *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *5 (Del. Ch. Oct. 16, 2013); *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *8 (Del. Ch. Nov. 30, 2007) ("The accelerated vesting of options does not create a conflict of interest because the interests of the shareholders and directors are aligned in obtaining the highest price."); *Nguyen*, 2016 WL 5404095, at *5 ("It is well-settled that where the interests of directors and stockholders are aligned . . . the accelerated vesting of shares in a merger does not create a conflict of interest.").

[113] *Novell*, 2013 WL 322560, at *11.

speaking to improper motivations, such as a pressing need for liquidity[114] or other circumstance giving rise to a rational inference that Prusch acted to further his own self-interest, Plaintiff's theory of conflict with respect to Prusch must fail.[115]

Plaintiff next asserts that Brown was conflicted because he was Engaged's Board appointee and "put forth Engaged's objective of exiting its investment in Outerwall" ahead of the interests of Outerwall stockholders.[116] But Delaware law is clear that a director's independence is not compromised by virtue of his status as a stockholder appointee.[117] And Plaintiff's assertion that Brown prioritized Engaged's

---

[114] *In re Answers Corp. S'holders Litig.*, 2012 WL 1253072, at *7 (Del. Ch. Apr. 11, 2012) (observing at the pleading stage that "[l]iquidity has been recognized as a benefit that may lead directors to breach their fiduciary duties" and concluding that a large stockholder with two board appointees had a unique interest in a prompt liquidation event); *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888, at *9 (Del. Ch. Sept. 30, 2011) (observing that "[l]iquidity has been recognized as a benefit that may lead directors to breach their fiduciary duties" and finding at the pleading stage that a CEO's "desperate[]" need for liquidity rendered him conflicted).

[115] In support of a contrary position, Plaintiff cites *Lukens* and asserts that the Court there "treat[ed] [an] inside director as interested . . . because of personal financial rewards" flowing from a golden parachute. Pl.'s Answering Br. at 37. This is an ambitious reading of *Lukens*. In *Lukens*, the Court briefly assumed that the director alleged to have benefitted from golden parachute payments was conflicted. 757 A.2d at 730. It did so to make the point that alleging one director was conflicted, without alleging that director dominated or controlled a majority of the board, fails to establish the board as a whole lacked independence. *Id.* The Court went on to infer that the competing bidder would make the golden parachute payments as well, and concluded that there was "no basis for inferring that directorial approval of a transaction providing for their payment was the product of disloyalty or bad faith." *Id.*

[116] Pl.'s Answering Br. at 37–38.

[117] *See, e.g.*, *KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014) (holding that the plaintiff failed to plead that a director lacked independence simply because she was appointed to the target's board by the stockholder that eventually acquired

29

exit over the interests of Outerwall stockholders is conclusory in nature and is unsupported by well-pleaded facts in the Amended Complaint.[118] For those reasons, Plaintiff's theory of conflict with respect to Brown must fail.[119]

Finally, Plaintiff's theory that Smith was conflicted by pursuit of post-close employment also fails. The Proxy clearly states that "[n]either [Apollo] nor any other potential bidder engaged in any discussions regarding the retention of the Company's executive officers and/or directors during the negotiation and bid submission process."[120] Plaintiff has not challenged the veracity of this disclosure.

---

it); *W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *15 (Del. Ch. May 22, 2000) ("As a preliminary matter, I note that even if American General nominated some of the outside directors . . . such nomination, without more, does not mandate a finding that these directors were beholden to American General . . . .").

[118] *Cf. In re Coty Inc. S'holder Litig.*, 2020 WL 4743515, at *8 (Del. Ch. Aug. 17, 2020) (finding that the complaint had sufficiently alleged that a director acted to advance the self-interest of his appointing stockholder in connection with the challenged tender offer because the director "allegedly made sure the projections the Special Committee and its financial advisor . . . used in connection with the [t]ender [o]ffer were understated and kept the market in the dark about [the company's] strategic plan, which helped create uncertainty to benefit [the appointing stockholder's] plan to acquire majority ownership at the expense of [the] public stockholders." (internal quotation marks and citations omitted)).

[119] Plaintiff also asserts in briefing that Brown had "a long history of being appointed to companies' boards to push a merger or acquisition for short-term profit, including other companies that Engaged had targeted for a sale in the past." Pl.'s Answering Br. at 37. Insofar as Plaintiff asserts that this gives rise to conflict, that assertion fails. Plaintiff provides no support for the proposition that a director is conflicted purely by virtue of his track record, and I am aware of none.

[120] D.I. 22, Ex. 18 at 2. In the Section 220 Action, Chancellor Bouchard concluded there was no credible basis to infer wrongdoing in the pursuit of post-close employment. He pointed out the Proxy "firmly denies that any discussions concerning the retention of any of [Outerwall's] executive officers and directors occurred during the sale process," and the

In the absence of well-pled, non-conclusory allegations to the contrary, it would be unreasonable to infer that Smith and Apollo discussed the terms of post-close employment.

Plaintiff offers only in passing that Smith's "interest in securing post-close employment upon completion of the Acquisition" rendered him conflicted.[121] This quoted language is Plaintiff's only effort to brief his contention that Smith was conflicted; Plaintiff does not argue that Smith's interactions with Apollo resulted in any post-close employment arrangement.[122] "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed

---

stockholder offered no evidence to support a reasonable inference to the contrary. D.I. 22, Ex. 23 at 61.

[121] Pl.'s Answering Br. at 30; Am. Compl. ¶ 153.

[122] The Amended Complaint alleges that Smith met with potential buyers and, with Prusch, controlled the initial process, and that "Apollo conveyed that it intended to retain Smith and the rest of his management team to carry out the Company's long-term plan once the Acquisition was completed." Am. Compl. ¶¶ 120, 121, 153. Plaintiff did not invoke these allegations in briefing. These abandoned and general allegations fail to rebut the Proxy's assurance that "[n]either [Apollo] nor any other potential bidder engaged in any discussions regarding the retention of the Company's executive officers and/or directors during the negotiation and bid submission process." D.I. 22, Ex. 18 at 2. As the Chancellor put it in the Section 220 Action, allegations of management involvement in the sale process "[w]ithout more . . . do not provide sufficient evidence of a credible basis to infer that the sale process was corrupted by management's self-interest in the pursuit of post-closing employment terms." D.I. 22, Ex. 23 at 64–65.

The Amended Complaint also alleges Smith stood to benefit from "cashing out his shares of Outerwall stock, the acceleration of vested and unvested stock options, change in control payments, and other benefits" as a result of the Acquisition. Plaintiff did not brief these benefits as a source of conflict for Smith. Am. Compl. ¶ 17; *see also id.* ¶¶ 151, 157. "Issues not briefed are deemed waived." *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999).

waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."[123] Plaintiff has failed to plead that Brown was conflicted by pursuit of post-close employment, where the unchallenged Proxy clearly states no such negotiations occurred.

In sum, Plaintiff has failed to plead facts making it reasonably conceivable that any Defendant was conflicted. Plaintiff has failed to plead a non-exculpated fiduciary duty claim against each Director Defendant under *Revlon*. And Plaintiff has failed to adequately plead his claim that Smith breached his duty of loyalty.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.

---

[123] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *12 n.152 (Del. Ch. Jan. 25, 2013) (quoting *Roca v. E.I. du Pont de Nemours & Co.*, 842 A.2d 1238, 1242 n.12 (Del. 2004)).